McCOMB, Administrator of Wage and Hour Division, U. S. Department of Labor, v. SOUTHERN WEIGHING & INSPECTION BUREAU.

No. 5780.

United States Court of Appeals
Fourth Circuit.

Nov. 5, 1948.

Bessie Margolin, Assistant Solicitor, of Washington, D. C. (William S. Tyson, Solicitor, Frederick U. Reel and Helen Grundstein, Attorneys, all of Washington, D. C., and Beverley R. Worrell, Regional Attorney, United States Department of Labor, of Birmingham, Ala., on brief) for Appellant, and Thomas B. Gay, of Richmond, Va.

(Hunton, Williams, Anderson, Gay & Moore, and H. Merrill Pasco, all of Richmond, Va., on brief) for Appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

This is an appeal from a summary judgment for defendant dismissing a suit instituted by the Administrator of the Wage and Hour Division of the Department of Labor to enjoin alleged violations of the maximum hour provisions of the Fair Labor Standards Act of 1938, 29 U.S.C.A. §§ 201–219, and regulations promulgated under the Act with regard to the keeping of records. The defendant in the court below, appellee here, is the Southern Weighing and Inspection Bureau, one of six associated bureaus maintained by the railroads operating in the southeastern portion of the United States to perform transportation services which they can perform more economically and satisfactorily through a common bureau serving them all than through individual effort on the part of each railroad. The court below held the bureau not subject to the Act on the ground that it was "no more than a joint department of the member lines of the common carriers involved and that the employees in question are the joint employees of such common carriers". The court concluded that they were employees of employers subject to the provisions of Part I of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., and hence excepted by section 13(b) (2) of the Fair Labor Standards Act. 29 U.S.C.A. § 213(b) (2). We think that this was clearly correct.

The facts are that the bureau is not a corporation, or a partnership or an independent business undertaking of any sort, but, precisely what it professes to be, a department maintained by a number of railroads jointly for enforcing certain standards necessary to the performance of their duties as common carriers in the transportation of freight. Its purpose as set forth in the articles of association under which it is organized is "to promote and obtain, through inspection and supervision, correct and uniform weighing, classification, marking and packing of freight originating at, or passing through, or destined to points on and east of the Mississippi River, and on and South of the Ohio and Potomac Rivers." It is controlled by an executive committee composed of officials of the member railroads, and the one hundred and seventy odd employees which it directs are paid from funds belonging to the railroads through checks issued by the Southeastern Railroads Associated Bureaus, an accounting and treasury department of six bureaus maintained by the railroads for handling matters of common concern. Any increase in pay which might result from holding the Fair Labor Standards Act applicable here would be paid by the railroads from these funds.

The services performed by the employees here involved are services for the railroads. They are directly connected with transportation in interstate commerce and relate to matters covered by tariffs and regulations which the railroads have filed with the Interstate Commerce Commission. The bureau makes no charge to the railroads for these services, but the fund which has been set up for the operations of the bureau is reimbursed by each railroad for the actual cost of services performed for it. The bureau renders no service to shippers or the public, although the same functions that its employees perform for member railroads are performed, upon request, for non-member railroads at cost.

The bureau operates under its name as a bureau and keeps records, hires and discharges employees, makes purchases, procures certain insurance, has its telephone listed and does several other things in that name. All of this, however, is manifestly a mere matter of convenience and does not indicate that the bureau is anything other than a joint department maintained by the railroads. It owns no property except such items as office equipment, portable scales and inspection tools. It rents office space; but this is paid for by the member railroads through the funds handled by the Southeastern Railroads Associated Bureaus. It does not make or attempt to make any profit, but each member railroad pays monthly assessments on the basis of services received, and the total of these for each month equals the total of salaries, wages

and other expenses. Official accounts carried and maintained by government agencies in connection with the Railroad Retirement Act, 45 U.S.C.A. § 228a et seq., the Railroad Unemployment Insurance Act, 45 U.S.C.A. § 351 et seq., and the Carriers Taxing Act of 1937, 45 U.S.C.A. § 261 et seq., are in the name of the bureau as employer; but all taxes imposed are, like rent and wages, paid by the member railroads through funds handled by the Southeastern Railroads Associated Bureaus.

The employees here involved receive wages comparable in amount to wages paid to other railroad employees, and they have received the general wage increases granted other railroad employees. For many years the Interstate Commerce Commission has recognized their status as employees of the railroads and has approved their being allowed free transportation in that capacity in accordance with section 1(7) of the Interstate Commerce Act. In "Employee" under Railway Labor Act, 136 I.C.C. 321, which determined the status of personnel of a certain Trunk Line Association, the commission said:

"The status of some of these employees has been previously determined in connection with the use of free transportation, In Conf. Ruling 371, which relates to free transportation of employees of bureaus of carriers, we said: The following persons may lawfully use free transportation: (a) Employees of a weighing and inspection bureau who perform and supervise the weighing of cars for the carriers maintaining such bureau are exclusively engaged upon the work of such carriers, and are subject to the direction of their officials, but report to and are paid by the weighing and inspection bureau."

The Trunk Line Association dealt with by the commission was precisely the 'sort of joint undertaking on the part of railroads as is involved here, and in holding the employees working under the Association to be employees of the railroads within the meaning of the Railway Labor Act, 45 U.S.C.A. § 151 et seq., the commission used language which is very pertinent to the case before us. It said:

"The Trunk Line Association is exclusively in the service of certain carriers and performing work for them. The performance of such work is the sole function of the association. The character of the work is the same as that ordinarily performed by employees or subordinate officials of common carriers and which the carriers otherwise must perform individually in order to render adequate transportation service. The member carriers through their executive officers who form the Trunk Line Association committee have sole and continuing authority to supervise and direct the personnel of the association in all matters relating to the rendition of services.

"It is therefore found that the work defined as that of an employee or subordinate official in orders of this commission now in effect defining and classifying employees and subordinate officials of common carriers includes the work of employees of the Trunk Line Association and brings employees performing the work of said association within the term 'employee' as used in the railway labor act."

Section 13(b) of the Fair Labor Standards Act, 52 Stat. 1068, 29 U.S.C.A. § 213 (b), provides:

"(b) The provisions of section 7 shall not apply with respect to * * * (2) any employee of an employer subject to the provisions of Part I of the Interstate Commerce Act."

Since section 7 of the Fair Labor Standards Act is the section dealing with maximum hours, and since it is clear from what we have said above that the employees here involved are employees of the railroads who are employers subject to Part I of the Interstate Commerce Act, it follows that they are exempted from the maximum hours provision of the Fair Labor Standards Act by the provision of section 13(b) which we have quoted. Such was the holding of the Court of Appeals of the Seventh Circuit in Walling v. Western Weighing & Inspection Bureau, 7 Cir., 160 F.2d 47, 50, a case in all respects similar to the case at bar; and we thoroughly concur in both the reasoning and conclusion of the opinion of Judge Major speaking for the court in that case, wherein he said:

"In our judgment, defendant is nothing more than an instrumentality of the rail-

roads or, as the lower court said, 'a joint department of the member railroads which set it up.' Every function which it performs is directly on behalf of the railroads and it has no authority or power except that which they expressly delegate to it. It has neither profit nor profit motive and handles no money of its own. Every phase of its activities is directed, controlled and managed by agents and officers appointed and paid by the railroads.

"* * * In reality it hires as an agent or department of the railroads, it pays with money furnished by the railroads and supervises only in accordance with and to the extent authorized by the railroads.

"* * * the defendant is under the general direction of a managing committee which consists of nine members, each member being also an officer of a different member road. The managing committee of the defendant appoints the manager of the defendant who manages the defendant. The manager hires personnel to carry on the functions of the defendant hereinafter described. The manager of defendant is paid an annual salary which is fixed as to the amount by the managing committee. The managing committee exercises general supervision over the defendant. All the employees of the defendant are employed or discharged by the manager or by subordinate officials of the defendant who are under the manager's supervision. All of defendant's expenses, including the salaries of officers and wages of employees, are paid by the railroads in proportion to the amount of services rendered by the defendant to each of the railroads respectively. More than that, if plaintiff should prevail in this suit and the employees were awarded additional compensation by way of overtime payments or otherwise, such award would be paid by the railroads and not by the defendant."

Very much in point, also, is the case of McComb v. McKay, 8 Cir., 164 F.2d 40, 49, relating to employees engaged in a yard maintained on a railroad right of way for the manufacture, repair and storage of temporary grain doors and coal doors for freight cars. The employees were hired, supervised and discharged by McKay Brothers who were compensated on a piece work basis. In holding that the employees fell within the exemption of section 13(b)(2) of the Act, Judge Sanborn, speaking for the court, said:

"It seems obvious to us that the making, repairing and storing of temporary grain doors and coal doors which are essential for the shipment of grain and coal are necessary parts of the business of the railroad. If the McKays represent the railroad in employing men and supervising the operations at the grain door yard, as the District Court determined, the men are not in any proper sense employees of the McKays, but are employees of the railroad and exempt from the provisions of § 7 of the Act. We think that the employees reasonably cannot be regarded as employees of the McKays for the purpose of § 7 of the Act and as employees of the railroad for other purposes. They are employees of the McKays or of the railroad, but not of both."

That the Fair Labor Standards Act is to be interpreted as excluding from its maximum hour provisions the employees here involved, follows not only from the express language of section 13(b)(2) quoted above, but also from the reason and spirit of the Act and the history of its passage through Congress. It was manifestly intended that exclusive power to regulate hours of labor for employees of railroads should rest with the Interstate Commerce Commission and that there should be no division of responsibility for supervising the operations of interstate carriers, a matter where unity of control was of the utmost importance and where it had been exercised by the commission for a long period to the entire satisfaction of the country at large. When the Fair Labor Standards Act was first introduced into Congress, it made no exception of railroad labor; but amendments were introduced which exempted first railway employees subject to the Hours of Service Act, 45 U.S.C.A. § 61 et seq., then those subject to the Railway Labor Act and finally those who were employees of an employer subject to the provisions of Part I of the Interstate Commerce Act. The history of the amendment of the Act is to be found in Judge O'Connor's opinion in Keele v. Union Pacific R. Co., D.C., 78 F.Supp. 678, 682, wherein is set forth the argument of

Congressman Mead in favor of the amendment which was proposed by Congressman Crosser and was finally adopted as section 13(b)(2). Congressman Mead said:

"For a long period of time the House has eliminated railroad workers from various acts which apply to industrial workers. This was done in the case of the Wagner Labor Relations Act, 29 U.S.C.A. § 151 et seq., again in the passage of the Social Security Act, 42 U.S.C.A. § 301 et seq., and prior to that in the passage of the National Recovery Act, 48 Stat. 195. The railroads and the railroad industry have their own social and labor legislation. As you know, they have the Adamson Hours of Service Act, the Railroad Labor Act with its Mediation and Arbitration Boards, and they have the Railroad Retirement Act, 45 U.S.C.A. § 201 et seq. Therefore there is sufficient precedent for the committee to accept the amendment of the distinguished gentleman from Ohio (Mr. Crosser) *and in doing so eliminate all railroad workers from the provisions of this bill.*" (Emphasis supplied.)

The cases upon which the Administrator relies are readily distinguishable. Boutell v. Walling 327 U.S. 463, 66 S.Ct. 631, 90 L.Ed. 786, involved employees in a garage operated by persons who were also stockholders in a corporation which operated a truck line. The court based its decision on a holding of the commission that it had no jurisdiction over employees of commercial garages and the fact that the employees involved were employees of a garage and not employees of the trucking corporation. In Wabash Radio Corp. v. Walling, 6 Cir., 162 F.2d 391, 394, the employees involved were employees of a radio corporation which was wholly owned by a railroad but which had been organized to perform a function which the railroad was not allowed to perform. The court said, "Since the device was deliberately adopted in order to secure these advantages for the railroad, the identity of corporate existence cannot now be ignored on behalf of the railroad." The other cases, McComb v. Farmers Reservoir & Irr. Co., 10 Cir., 167 F.2d 911, and

Meeker Co-op Light & Power Ass'n v. Phillips, 8 Cir., 158 F.2d 698, held merely that employees of farmers' cooperatives engaged in irrigation or the distribution of electricity were not engaged in agriculture within the meaning of the Act. In none of these cases was the fact situation in anywise comparable to that existing here, and nothing said in any of them lends any support to the proposition that railroad employees, engaged in a service which is an essential part of interstate transportation, lose their status as such and are removed from the control of the Interstate Commerce Commission merely because they perform the service under the direction of a bureau maintained by the railroads jointly, instead of under the direction of the officers of a single railroad.

Point is made that, whatever view be taken of the facts before the court, there was error in entering summary judgment instead of setting the case down for further hearing; but this point is entirely without substance. The facts were fully developed by affidavit and there was no dispute as to any of them. In addition to the affidavits, depositions were taken, interrogatories were answered and the bureau was inspected by officials of the wage and hour division. The matters which the administrator suggests that he might be able to develop on further hearing, such as details of property owned by the bureau, the policing of grain door reclamation, protection of members from undercharges, or reasons of Dun & Bradstreet for their credit opinion, could in no way affect the conclusion to be drawn from the admitted facts. Everything that the administrator says that he hopes to show on further hearing may be admitted, and the result remains the same. Under such circumstances there is no reason why summary judgment should not be entered and the litigation ended. Federal Rules of Civil Procedure, rule 56, 28 U.S.C.A.

The judgment appealed from is correct and will be affirmed.

Affirmed.