James P. MITCHELL, Secretary of Labor, United States Department of Labor,

v.

BALTIMORE & ANNAPOLIS RAILROAD COMPANY.

Civ. A. No. 11013.

United States District Court
D. Maryland,
Civil Division.
April 22, 1960.

Morton I. Schwartzman, Baltimore, Md., Stuart Rothman, Washington, D. C., Howard W. Fineshriber, Chambersburg, Pa., for plaintiff.

C. H. Johns, Washington, D. C., Leon H. A. Pierson, U. S. Atty., Baltimore, Md., for Interstate Commerce Commission.

Joseph I. Huesman, Baltimore, Md., for defendant.

CHESNUT, District Judge.

The question in this case is whether the Baltimore & Annapolis Railroad Company is wholly or only partially exempt from the provisions of the Fair Labor Standards Act (Wage & Hour), 29 U.S.C.A. § 201 et seq. A brief history of the Company is of local interest and is important to an understanding of the respective contentions of the Secretary and the Company.

Prior to 1900 the Baltimore & Annapolis Railroad Company (popularly known as the Short Line from Baltimore to Annapolis) operated a steam railroad from Baltimore to Annapolis, the trains starting from the well-known terminal of the B. and O. Railroad at Camden Station in Baltimore, for a short distance over tracks of the B. and O. and then for about 26 miles on its own tracks to Annapolis which, of course, is the county seat of Anne Arundel County, Maryland, and includes the seat of the State Government and the United States Naval Academy. In the progress in the forms of transportation the motive power of the trains was changed from steam to electricity and a special bond issue was made to cover the cost of electro-equipment. About 1920 the B. & A. was corporately merged with the Washington, Baltimore & Annapolis Railway Co., (known as the W. B. & A.) which operated an electric power railway from Baltimore to Washington and separately from Washington to Annapolis. In 1931

the W. B. & A. went into equity receivership in this court (R. E. Duvall Co. Inc., v. Washington, Baltimore & Annapolis Electric R. Co. et al., Equity Docket No. 1826). As a result of the receivership case the B. & A. portion of the system was taken over under the bond issue referred to and in 1935 a new corporation was formed known as the Baltimore & Annapolis Railroad Company, the present Company. It continued its electric powered line from Baltimore to Annapolis with some ancillary motor bus service until 1950 when, by order of the Maryland Public Service Commission it was given authority to operate a motor bus line between Baltimore and Annapolis. At that time other prospectively interested bus lines had applied for authority, but, after hearing, the B. & A. was given the right to operate. Since 1950 the transportation of passengers between Baltimore and Annapolis has been wholly transferred to the motor bus service, but the Railroad still continues to haul freight over its rail line substituting a diesel engine for electric power.

The Company contends that it is wholly exempt from the provisions of the Wage & Hour Law under section 213(a) (9) which provides:

"§ 213(a) The provisions of sections 206 and 207 of this title shall not apply with respect to * * *

"(9) any employee of a street, suburban or interurban electric railway, or local trolley or motor bus carrier, not included in other exemptions contained in this section;".

Section 206 requires a minimum wage of not less than $1 per hour for employees in commerce; and section 207 requires compensation at the rate of not less than one and one-half times the regular rate paid the employees for all hours worked in excess of 40 hours a week.

The main contention of the Secretary is that certain employees engaged in service for the motor bus operation of the Company are subject to the provi-

sions of section 207; but even as to them the Company contends that it is exempt under the provisions of section 213(b) (2) which reads:

"(b) The provisions of section 207 of this title shall not apply with respect to * * * (2) any employee of an employer subject to the provisions of sections 1–27 of Title 49,"

and the defendant refers to several rulings of the Interstate Commerce Commission to the effect that the defendant is subject to Part I of the Interstate Commerce Act, §§ 1–27.

With respect to the contentions of the Secretary it is to be noted that the extent of practical application that it would have if sustained is very limited in this case. The Company employs in all 119 employees for the whole of its operations both as to freight by rail and passengers by bus service. It is not disputed by the Secretary that all employees engaged in service for the rail line are exempt from the overtime provision of section 207. And all the drivers of the buses are also exempt under section 213(b) which provides:

"(b) The provisions of section 207 of this title shall not apply with respect to (1) any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 304 of Title 49." Part II of the Interstate Commerce Act, 49 U.S.C.A., relating to Motor Carriers.

With respect to the application of section 206, it is not contended by the Company that its employees engaged in rail transportation service are not subject to the minimum wage per hour but it is also not disputed by the Secretary that all employees of the Company, both in train and bus service, are now being paid at the minimum hourly rate. It has also been agreed that only for a few weeks after the increase of the hourly rate to $1 per hour, was there any failure to pay the full $1 per hour and the deficiency during that time was .only a

few cents per hour below the minimum. The complaint filed by the Secretary in this case merely prays for the issuance of an injunction to require the Company to comply in the future with the Act. It is not disputed that the issuance of an injunction is discretionary with the court; and as the Company is now in full compliance with section 206, I do not think that an injunction is reasonably required for the future so far as section 206 is concerned, especially as counsel for the Secretary emphasizes that his contention in substance relates to the over-time provision of section 207. The Secretary's complaint does not, as indeed at present it could not, seek to require the Company to pay past extra wages for over-time work. See 29 U.S. C.A. § 217.

After deducting from the total number of the Company's employees those which the Secretary concedes are not subject to the Act, there remain only 17 who the Secretary contends should have been paid over-time wages under section 207. And as to more than half of them, the Company contends, with some plausibility, that they are exempt as administrative employees under section 213(a) (1) or as engaged in service which makes them exempt under section 213(b) (1). In the view I take of this case it is not necessary to decide whether the defendant's contention as to some of these employees is correct.

After consideration of the oral arguments and briefs of counsel, I conclude that the employees of the Railroad Company are not subject to the provisions of section 207 by reason of the exemption given by section 213(b) (2). The legislative history of that section is quite important in the consideration of the respective contentions here. That history is partially given in the opinion of Chief Judge Parker of the Fourth Circuit in the case of McComb v. Southern Weighing & Inspection Bureau, 1948, 170 F.2d 526. In that case the opinion by Judge Parker approved the history of the section as given in more detail in the opinion of Judge O'Connor in the

case of Keele v. Union Pac. R. Co., D.C. S.D.Cal.1948, 78 F.Supp. 678. In brief substance the history is this. When the Wage & Hour Act was first introduced in the Senate by then Senator Black, it applied to employees of railroad companies; but first by proposed amendment there was an exemption to those railroad train employees who were subject to the Hours of Service Act as distinguished from the maintenance of way employees. As so limited there was still further objection from both the representatives of the railroad employees and from the railroads themselves. In the House, Mr. Crosser of Ohio proposed a broadening amendment to the exemption to include *all railroad employees* subject to Part I of the Interstate Commerce Act; and it *was said that this broader amendment* would be satisfactory to both labor and management. However, as the Act was finally passed the exemption was limited to the overtime provisions of section 207, thus leaving railroad employees subject to the minimum wage provision of section 206 which, as already explained, is not the controlling point in the instant case.

There is not and could not be any doubt that all employees of the Company were subject to the provisions of Part I of the Interstate Commerce Act, at least until 1950 when the transportation of passengers was begun by motor bus service. Ever since its new incorporation in 1935 the Company has filed annual reports with the Interstate Commerce Commission for *all* its employees and has paid the required assessments for them under the Railway Retirement Act (45 U.S.C.A. § 201 et seq.) and also under the Railroad Unemployment Insurance Act (45 U.S.C.A. § 351 et seq). In 1958 the Company paid into the Railway Retirement Fund $30,998 and into the Railroad Unemployment Insurance Fund $12,395. At least one of its employees is now currently receiving retirement pay under the Retirement Act. It also appears that in a number of recent proceedings (in 1953, 1954 and 1955) before the Interstate Commerce

Commission the latter has recognized the Company as subject to the provisions of Part I of the Interstate Commerce Act. See the stipulation in this case including copies of the several proceedings. From them it appears that the defendant sought to combine with or acquire certain additional bus routes but was denied permission to do so by the Commission on the ground that the defendant was subject to Part I of the Interstate Commerce Act and under the particular sections referred to the Commission found the application was not in compliance with the applicable provision. It also appeared from these proceedings that the Commission was fully acquainted with the motor bus activities of the defendant.

I have not failed to carefully consider the arguments of counsel for the Secretary that some or all of the 17 employees above referred to are subject to the over-time provisions under section 207. The contention is that these 17 employees engaged in various capacities with the activities of the bus company rather than the rail transportation are not subject to Part I of the Interstate Commerce Act. The argument is that since the transportation of passengers by the defendant Company is now wholly by bus service, that portion of the Company's activities (excluding of course the services of the drivers of the buses, more than 60 in number) are engaged in an activity other than that of a railroad. Support for this contention is thought to be found in several judicial opinions, only two of which, however, seem to be sufficiently in point for particular consideration. Walling v. Connecticut Co., 2 Cir., 1946, 154 F.2d 552 and Wabash Radio Corp. v. Walling, 6 Cir., 1947, 162 F.2d 391. In the former, the court was dealing with the exemption provided for in section 213(a) (9) and not section 213(b) (2). There the employees of an electric railway engaged in services to the Company in the operation of an electric power plant which supplied some electric power to the trolley company but the larger part of whose power output

was sold to other companies, were held subject to section 207 of the Act. In the second case employees of a radio station formerly operated by the Railroad Company but subsequently by a separate corporation as a subsidiary of the Railroad Company, were also held subject to section 207 of the Act. But I think the factual differences between those cases and the present are sufficient to distinguish them from the instant case.

I do not overlook the rule of interpretation that is generally applied to the Wage & Hour Law, to the effect that the positive provisions of the law are to be liberally interpreted as remedial legislation and the exemptions should be narrowly construed, and that there is an obligation on the part of one who asserts them to show that they are fairly applicable.

In considering section 213(b) (2) I think it is important to note that the exemption is precisely worded in terms of the status of the employer rather than in the trade activities of the employees. Section 213 contains about 24 different exemptions. Some are phrased with regard to the activities of the employee while others are phrased with reference to the nature of the business of the employer. Section 213(b) (2) is one of the exemptions phrased with special reference to the employer rather than to the employee. And I think it is important to also note that this distinction seems to have been approved in the reasoning in the McComb case, supra, in the Fourth Circuit, and in the Keele case, supra, in the Southern District of California, in the opinion of Judge O'Connor giving the legislative history of the exemption.

It will be noted that the contention of the plaintiff in this case seems to be contrary to the position taken by the Interstate Commerce Commission and logically it may be said that the position taken by the defendant in this case may be considered inconsistent with the basis of its application to the Interstate Commerce Commission. However, we are dealing with specific language in the Act of Congress regarding exemptions which include in section 213(b) (2) an employer subject to the provisions of sections 1–27, Part I of the Interstate Commerce Act. In the proceedings before the Interstate Commerce Commission referred to and contained in the stipulations, the Interstate Commerce Commission has consistently made the basis of its orders that the defendant is a rail carrier subject to the provisions of sections 1–27 of the Interstate Commerce Act; and the defendant has been required to and has consistently observed the requirements of the Commission regarding *all* its employees. I find no sufficient basis for disregarding this long-continued treatment of the defendant by the Interstate Commerce Commission, and the defendant's consistent compliance therewith regarding the payment of required amounts into the Retirement Fund and into the Unemployment Insurance Fund for the benefit of its employees. The defendant, not unnaturally, objects to being subjected to the burdens of compliance with the requirements of two separate regulatory government agencies. Of course the ultimate question is, as a matter of law, whether the defendant is legally subject to both or only one. Probably the possibility of such a conflict exists only with regard to this particular defendant in view of its history. It may be thought that the literal application of section 213(b) (2) is logically inappropriate to the defendant's precise situation which has come about as a matter of history, but if so, the remedy would seem to be by further legislation rather than ignoring in the present case the long consistent administrative practice in the Interstate Commerce Commission regarding this defendant.

I also think the Company is exempt from the provisions of both sections 206 and 207 under section 213(a) (9) above quoted, which exempts "any employee of a * * * local trolley or motorbus carrier". Counsel for the Secretary contends that the Company is not a local

but an interurban motor bus carrier; but in considering the problem I think it is very important to bear in mind two factors, one relating to the present characteristics of the defendant's route between Baltimore and Annapolis and the other to the progressive changes which have occurred in transportation of passengers either within the strictly municipal boundaries of a particular city or in the more expanding metropolitan district adjoining a city.

In Baltimore City alone, more than a hundred years ago, the first form of public transportation was an omnibus drawn by horses; later followed by street cars running on tracks and drawn by horses; and in turn superseded as to motive power either by underground cable or overhead electric trolley wires; which, in turn, has now been almost wholly succeeded by motor bus transportation.

■ With respect to transportation of passengers outside the city limits or into what was then called the country, the first form of public transportation was by steam power running on rails which, for accommodation of persons living in the country, made frequent train stops and such trains so stopping were called "local accommodation trains". In later years the motive power has now very generally been changed to either diesel electric or, as notably in the case of the Pennsylvania Railroad from Washington to New York, by overhead high-tension electric wires. It is also a matter of common knowledge that so-called interurban passenger transportation has been changed as to motive power from overhead trolley lines to motor bus.

More importantly it is necessary to bear in mind the change that has taken place in the last 15 to 20 years in the local conditions of the roadway from Baltimore to Annapolis. Twenty years ago the roadway from Baltimore to Annapolis was a comparatively narrow and rather winding road, but about 1945 the State built what is now known as the Ritchie Highway extending from near the limits of Baltimore City to Annapolis, a dual highway with two lanes south and two lanes north separated by an intervening grass strip. As appears from the evidence in this case, particularly that of Mr. Lissberger, an officer of the Anne Arundel County Trade Council, there has in recent years been a very great increase in the population of Anne Arundel County, adjoining Baltimore City and continuing to Annapolis. Many new industries have been established in or near the Ritchie Highway, and many residences have been built fronting on or near to the Highway, and the population along it has greatly increased. At the present time it is said that land values along the Ritchie Highway have increased in market value to about $5,000 an acre. From Baltimore to Glen Burnie is about 10 miles and is in fact almost wholly a continuous locality practically like a long city street. In 1950 the Company converted its passenger transportation from the rail line to motor bus service under permit from the Maryland Public Service Commission and this in turn has again greatly stimulated the development of property along the whole of the Ritchie Highway to Annapolis. Counsel for the Secretary concedes that at least from Baltimore to Glen Burnie, a town, although not incorporated, of several thousand persons and several enterprises, the Company can fairly be said to be operating a local motor bus line. But the development of the territory has not ceased at Glen Burnie. Very shortly to the south toward Annapolis a residential settlement known as Harundale consisting of nearly one thousand homes with schools, shopping centers, churches, etc., has been established. From there on to Annapolis the roadway skirts other large residential settlements, one of which is Severna Park. And for several miles the Ritchie Highway runs approximately parallel to and between two important rivers, the Magothy on the east and the Severn on the west. For about every mile or less of this route, improved hard-surface roadways have been built by the County for a distance of one, two or three miles to residential

settlements of these two rivers, and many new homes have been built along these intersecting roadways, with schools and churches conveniently nearby. The Company's bus line serves this whole area and the buses make frequent stops along the highway to take on and discharge passengers and to transport school children and other persons needing public transportation. It is the only form of public transportation for this whole area from Baltimore to Annapolis.

The word "local" is only a relative term. What may have been a proper description of the Company's line prior to 1950 as "interurban" has now become what, in my opinion, can properly be termed "local". The mere length of the line, only 26 miles, does not of itself prevent it from being regarded as local. In or near Baltimore City at the present time there are several bus or trolley lines which are many miles in length, as, for instance, the now still existing trolley line from Catonsville in Baltimore County, west of Baltimore City, through Baltimore City to Towson, the county seat of Baltimore County, a distance of approximately 15 miles.

Counsel for the Secretary offers in support of his contention that the Company's motor bus line to Annapolis is not a local bus line, a pamphlet issued in 1944 by the then Administrator of the Wage & Hour Law, which presented 12 factual points for consideration in determining whether a motor bus line could be considered "local". These tests were not in the nature of regulations having the force of law but merely points for practical consideration. The evidence in this case relates to practically all of these 12 points; and I find from that evidence that the characteristics of the service furnished by the Company is substantially in accordance with practically all of the 12 points and particularly with the first three emphasized in the Bulletin as the more important, as to which there is full accordance by the Company. I think it unnecessary to consider them in numerical detail because I find that they have been heretofore so considered

in the opinion of Circuit Judge Augustus N. Hand in the case of Gillette v. Rockland Coaches, Inc., 2 Cir., 1944, 142 F.2d 616. In that case, as will be found from the opinion, the court determined on the facts that a motor bus line originating in New Jersey and running into New York City, a distance of something under 35 miles, was exempt under the provisions of section 213(a) (9). The 12 points referred to by the Secretary will be found in the file in this case and will also be found in a note to Judge Hand's opinion in the case just above cited. I think it unnecessary to discuss the evidence in particular detail because it would be largely one of duplication of what is found in the opinion in that case, with which I fully agree.

Another case dealing with a similar situation and in which a motor bus line was held to be local although 42 miles in length, is Conley v. Valley Motor Transit Co., 6 Cir., 1943, 139 F.2d 692. The opinion in that case by Circuit Judge Martin also considers in much detail the distinguishing characteristics of what constitutes a local motor bus line under section 213(a) (9). The Line in that case ran from Steubenville, Ohio, across the Ohio River into West Virginia and Pennsylvania. The factual situation as shown in the opinion is in its major and substantial aspects quite similar to that of the Company in the instant case.

Although I have found that the evidence in this case substantially complies with all or nearly all of the 12 points, nevertheless counsel for the Secretary maintains that the principal distinction between a local and an interurban bus line is to be found in the general sentence pointed out by the Bulletin reading: "The indispensable characteristic of a local motor bus carrier is that it is a carrier which serves an integrated commercial or industrial area for the purposes of carrying persons to and from their work in offices and factories, children to and from school daily, and other persons attending to necessary routine business". That is to say, the prime

contention of the Secretary is that the B. & A. Company does not serve an integrated community, apparently meaning thereby that its motor bus line is not wholly within the particular Baltimore area. However, the Bulletin referred to by the Administrator stated that he "realized no hard and fast rule is possible, and a determination would depend upon an appraisal of all the facts". If it be assumed that the Ritchie Highway from Baltimore to Annapolis prior to 1950 was not strictly speaking a wholly integrated area, I think the evidence in this case indicates quite clearly for all substantial purposes in relation to the Company's operations that it is now integrated. A passenger on a bus from Baltimore to Annapolis, other than possibly an express bus at certain times of the day, finds no substantial difference between a Baltimore City bus and a B. & A. bus with respect to equipment, collection of fares, lack of special equipment for baggage, stopping to take on and let off passengers and other particular features of bus transportation. In Baltimore City at the present time the minimum car fare for any distance, long or short, is 25 cents, while the evidence in this case is that the average single fare paid to the defendant is about 30 cents.

While counsel for the Secretary instances what he considers a number of distinguishing characteristics to differentiate the B. & A. bus service from that of a local motor bus line, I think it will be sufficient to refer to only some of the more important points which he seeks to emphasize.

For instance, it is said that the Company operates in addition to the regular bus line to Annapolis, a number of "chartered" buses. This of itself, however, is only an incident of bus lines in general.

The chartered service means that for some special occasion a particular group of passengers is transported to some particular place, as for instance, a group of school children to a museum or a group of persons to a particular place of amusement, as for instance in Anne Arundel County to a so-called "Bingo" party, or to some special football game. I think it is a matter of common knowledge that similar chartered bus service is given by the Baltimore Transit Company. It is true that some of these special chartered buses of the defendant run into another State, as for instance, to Atlantic City, N. J. And it appears that about 14% of the gross passenger fare revenues is derived from this interstate chartered service and that about 37% of the Company's gross passenger fares are from all its chartered services. However, it is not contended that the interstate feature of the chartered bus service of itself defeats its position as to local bus service. There were such interstate transportation features of the local bus lines in both of the cases above referred to, one in the Second Circuit and the other in the Sixth Circuit.

Again it is said that the Company at times runs a bus from Annapolis directly to one of the railroad stations in Baltimore City. But it appears that this is only a special accommodation for Naval Academy cadets and for a further convenience to them on such a trip they are allowed to carry their "duffle" bags with them. Such very particular accommodation for passengers is, I think, of too little consequence to be of any real significance.

For the above reasons I conclude that the plaintiff's bill for injunction should be and is now dismissed, and that judgment must be entered for the defendant.