**James D. HODGSON, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**Edward F. MAULDIN, in his Individual Capacity and as Administrator of the Estate of Leonard S. Preuit, Defendant.**

**Civ. A. No. 71–380.**

United States District Court, N. D. Alabama, Northwestern Division.

June 12, 1972.

As Amended June 15, 1972.

George Palmer, U. S. Dept. of Labor, Birmingham, Ala., for plaintiff.

E. B. Haltom, Jr., of Haltom & Patterson, Florence, Ala., for defendant.

## MEMORANDUM OPINION

### I. INTRODUCTION

LYNNE, Chief Judge.

This action was initiated by the Secretary of Labor for the purpose of enjoining and redressing alleged violations of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. In its complaint, the Labor Department prays for the following specific forms of relief:

(1) a mandatory injunction compelling the defendant (a) to compensate his employees at prevailing minimum wage rates as required by 29 U.S.C. § 206, and (b) to keep and preserve accurate records of employee wages, hours, and other conditions of employment in compliance with 29 C.F.R. § 516; and

(2) a monetary judgment representing the amount of unpaid minimum wages withheld by defendant from certain employees during the period extending from January 3, 1969, through December 23, 1970.

By way of answer, the defendant concedes his noncompliance with federal minimum wage and record-keeping requirements, but insists that such strictures have no application to him in view of the exemption embodied in § 13(a) (6) (E) of the Act, 29 U.S.C. § 213(a) (6) (E) (Supp.1972). It has been formally stipulated between the parties that the single issue to be adjudicated by this Court is whether the exemption relied upon by the defendant is available within the factual context of this case.

Section 13(a) (6) (E) reads as follows:

The provisions of sections 206 and 207 of this title shall not apply with respect to . . . any employee employed in agriculture . . . if such employee is *principally engaged in the range production of livestock*. 29 U.S.C. § 213(a) (6) (E) (Supp. 1972) (emphasis added).

This exemption was enacted by Congress in 1966 and to date has remained unexposed to judicial construction or application. In view of the novel and abstruse nature of the question presented, an extensive non-jury trial has been conducted in an effort to develop all factual data which might bear on the applicability of § 13(a) (6) (E) to the defendant's enterprise.

### II. FACTS

At all times relevant to this lawsuit, the defendant, Edward F. Mauldin, has conducted a vast cattle raising operation (herein referred to as the Mauldin-Preuit[1] enterprise) spanning some 7,215 acres in Lawrence and Colbert Counties, Alabama. Of the total acreage embraced by the defendant's operation, approximately 4,895 acres are devoted on a year-round basis to the production of beef cattle for commercial purposes.[2] This full-time cattle production land is divided either topographically or artificially into fifteen separate tracts, which have been euphemistically denominated

---

1. A substantial portion of this operation is managed by the defendant in his capacity as administrator of the estate of Leonard S. Preuit.

2. The remaining 2,320 acres are used on a part time basis for beef cattle production.

by the defendant as "ranges." Each tract, or "range," is in turn subdivided into from one to four fenced-in pastures. Fourteen of the fifteen tracts and their component pastures are used exclusively for herding and grazing purposes, whereas the fifteenth tract, locally known as the "Hall Place Range," serves as a central base for the reception, assortment, and dispersal of cattle, as well as a general headquarters for the entire Mauldin-Preuit enterprise.

The following charts roughly summarize the data on file concerning the various tracts of land which make up the defendant's cattle production enterprise:

FULL-TIME BEEF CATTLE PRODUCTION LAND

| Name of Tract | No. Fenced-in Acres | No. Pastures | Miles From Hqts. | Approx. No. Head of Cattle |
|---|---|---|---|---|
| Hall Place Range | 1040 | 4 | — | 75 |
| Streater Place Range | 300 | 2 | 15 | 100 |
| Beavers Crossroad Range | 460 | 1 | 12 | 200 |
| White Oak Range | 160 | 2 | 13 | 50 |
| Preuit Place Range | 200 | 4 | 10 | 100 |
| Reeder Place Range | 600 | 4 | 8 | 300 |
| Pullen Place Range | 375 | 2 | 5 | 125 |
| Rocky Hill Range | 60 | 1 | 5 | 40 |
| Sykes Place Range | 250 | 2 | 4 | 150 |
| Harris Place Range | 280 | 3 | 4 | 50 |
| Pittman Place Range | 300 | 1 | 3 | 225 |
| Second Street Range | 160 | 1 | 3 | 50 |
| Johnson Place Range | 160 | 1 | 2 | 125 |
| East Meadow Range | 220 | 1 | 2 | 150 |
| West Meadow Range | 330 | 1 | 2 | 250 |

TOTAL GRAZING ACREAGE W/IN ENTERPRISE

| | |
|---|---|
| Full-time grazing acreage | 4,895 acres |
| Part-time grazing acreage (Sudex) | 210 " |
| Part-time grazing acreage (Wheat) | 360 " |
| Other acreage set aside for grazing in winter months | 1,750 " |
| TOTAL GRAZING ACREAGE | 7,215 " |

The normal operation of the Mauldin-Preuit enterprise may be very generally described as follows. At periodic intervals during each year, Mr. Jack Mitchell, manager and field director of Mauldin-Preuit cattle operations, attends various livestock sales held around the state for the purpose of purchasing groups of yearlings. Following the consummation of any such purchase, the newly-acquired yearlings are transported by truck to the Hall Place Range where, upon arrival, they are innoculated, branded, tagged, dehorned, castrated, sprayed, and wormed. Thereafter, the calves are placed in an 80-acre "sick pasture" within the Hall Place Range for a three day recuperation period. Upon recuperation, the animals are sorted into herds according to size, quality, and breed, and each herd is collectively driven by horseback or transported by truck to a designated grazing pasture within any of the other fourteen tracts comprising the enterprise. It is contemplated that while the herds are in their re-

spective grazing pastures, each individual cow will gain from one-and-a-half to two pounds daily. Typically, when the average weight of the animal units within a particular herd reaches the 700-750 pound range, the herd is sold for profit to a "feeder" in a western or midwestern state.[3] The incessant process of purchasing, grazing, and selling beef cattle constitutes the very essence of the Mauldin-Preuit operation, and it recurs on a fairly large scale throughout each year.[4]

Certainly two of the most critical factual areas in determining the availability of the "range production" exemption in any case are (1) the nature and quality of the lands comprising the livestock operation in question, and (2) the principal duties and activities of the employees whose wages are at issue. For the most part, the defendant's lands are both noncultivated and unsuitable for cultivation because of poor soil texture and intermittently rugged terrain. Certain portions of the grazing surface, however, have at one time or another been artificially seeded or fertilized to supplement those grasses which are indigenous to the area. The duties of the Mauldin-Preuit employees are substantially identical,[5] and, according to the undisputed evidence on record, consist

primarily of constantly surveying and actively tending to the defendant's cattle. Because the potential availability of the "range production" exemption hinges so directly upon the nature of the Mauldin-Preuit lands and employee duties, each of these vital areas of fact will be explored in depth in the course of the discussion which follows.[6]

### III. DISCUSSION

Broadly stated, the single issue raised by this litigation is whether the employees of the Mauldin-Preuit beef cattle enterprise are "principally engaged in the range production of livestock" within the purview of 29 U.S.C. § 213(a) (6) (E). In approaching this issue, it should be recognized at the outset that the Mauldin-Preuit employees are undeniably engaged in producing "livestock" as that term has been traditionally used in both common parlance and judicial circles.[7] The vexing constructional problems which must now be resolved emanate wholly from Congress's inclusion of the word "range" within the statutory matrix. The presence of this single amorphous concept raises the following narrow questions of interpretation under the facts presented:

(1) whether the lands comprising the Mauldin-Preuit enterprise consti-

---

3. The "feeders" generally feed the cattle intensely for a relatively short period of time and then sell them to packing houses.

4. For example, during the years 1968 through 1971, the enterprise purchased 7,568 head of beef cattle and sold 7,677 head. The average number of head purchased annually during this period was 1,892, and annual sales averaged 1,919.

5. The attorneys for the Department of Labor have informed the Court that they wish to draw no material distinctions between the duties of the employees whose wages are at issue, but rather would have § 13(a) (6) (E) applied on an "all or none" basis. For this reason, the evidence concerning the nature of employee duties has been presented largely in categoric fashion with very little particularization as to individual employees.

6. For a consideration of the nature of the defendant's land, see text accompanying notes 15-17 *infra*. For a synopsis of the duties of the Mauldin-Preuit employees, see text accompanying notes 24-32 *infra*.

7. The term "livestock" has been generally defined as "domestic animals used or raised on a farm, especially those kept for profit." *E. g.*, Van Clief v. Comptroller of State of Maryland, 211 Md. 191, 126 A.2d 865, 866-867 (1956); Boland v. Cecil, 65 Cal.App.2d Supp. 832, 150 P.2d 819, 822 (1944). See also Webster's Seventh New Collegiate Dictionary 495 (1965). For cases recognizing that cattle raised for commercial purposes constitute "livestock," see Howard & Herrin v. Nashville, C. & St. L. Ry., 153 Tenn. 649, 284 S.W. 894, 896 (1926); Inman v. Chicago, M. & St. Paul Ry., 60 Iowa 459, 15 N.W. 286, 287 (1883); Mathews v. State, 39 Tex.Cr.R. 553, 47 S.W. 647, 648, 48 S.W. 189, 190 (1898).

tute "range" within the meaning of § 13(a) (6) (E); and

(2) whether the principal duties and activities of the Mauldin-Preuit employees constitute "range production" within the meaning of § 13(a) (6) (E).

The balance of this memorandum opinion will address each of these questions independently.

A. Do the lands comprising the Mauldin-Preuit enterprise constitute "range" within the meaning of § 13(a) (6) (E)?

 It is an elementary principle of statutory interpretation that "where the words [of a statute] are plain, there is no room for construction. . . . If the language be clear it is conclusive." Osaka Shosen Kaisha Line v. United States, 300 U.S. 98, 101, 57 S.Ct. 356, 357, 81 L.Ed. 532 (1937); United States v. General Elec. Co., 209 F.Supp. 197, 203 (E.D.Pa.1962). Since in the case at bar the key to the application of § 13(a) (6)

(E) lies in the meaning of the word "range," a morass of expert testimony and documentary evidence has been presented by each side in attempt to establish that "range" has a clear-cut intrinsic meaning. Regrettably, however, a dispassionate review of all the pertinent evidence reveals quite conclusively that there is far from an authoritative consensus as to what types of land may constitute "range."[8] Many of the proferred definitions, for example, are very broadly framed and would readily encompass the Mauldin-Preuit grazing lands; others, by contrast, are narrowly drawn and would clearly not extend to the defendant's lands.[9] In view of this sharp inconsistency, legislative history and administrative guidelines[10] take on prime significance in the quest to delineate the scope of "range" as used in § 13(a) (6) (E).

The legislative history of § 13(a) (6) (E) is, for the most part, surprisingly uninstructive as to the types of land which Congress intended to be embraced

8. Compare testimony of E. H. Wilson, John Montgomery, and E. F. Mauldin with testimony of Seward Allen. See also definitions of "range" set forth at Black's Law Dictionary 1426 (4th ed. 1968); Alabama Conservation Needs Committee, Alabama Soil & Water Conservation Needs Inventory 15 (1961); U. S. Dept. of Agriculture, Soil Conservation Service, Soil Conservation 156 (1966); 75 C.J.S. Range, at 457 (1952); 10 Encyclopedia Britannica Range (In Agriculture) 1156 (1970); cf. Phoenix Title and Trust Co. v. Smith, 101 Ariz. 101, 416 P.2d 425, 430 (1966); Missoula Trust & Sav. Bank v. Northern Pac. Ry., 76 Mont. 201, 245 P. 949, 951 (1926).

In considering the multifarious definitions of "range," it is well to bear in mind the sound adjuration of Judge Learned Hand that

". . . it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." Cabell v. Markham, 148 F.2d 737, 739 (2d Cir. 1945) (Hand, J.)

9. Illustrative of the divergency of views as to the proper scope of the term "range" is the testimony presented by expert witnesses in this case. For example, when questioned by the plaintiff's attorney, Mr. E. H. Wilson, Executive Vice-President of the Alabama Cattlemen's Association, and Mr. John Montgomery, head of the "cow-calf operation" in Town Creek, Alabama, presented very broad definitions of "range" which would easily embrace the defendant's grazing lands. On the other hand, Mr. Seward Allen, supervisor at TVA's Fertilizer Research Development Center, presented a narrow, academic definition of "range" which would probably not encompass the Mauldin-Preuit lands. See also dichotomy among the authorities cited in note 8 supra.

10. It is, of course, well settled that where the language of a statute leaves some doubt as to the meaning that Congress intended, resort to both legislative history and administrative interpretations is permissible. Burnet v. Chicago Portrait Co., 285 U.S. 1, 52 S.Ct. 275, 76 L.Ed. 587 (1931); Smith-Wynn Post No. 96, V.F.W. v. United States, 197 F.Supp. 140, 141 (M.D.Ala.1961).

## 308

by the term "range."[11] At no time was the term expressly defined in the congressional hearings or committee reports, and apparently the salient characteristics of "range" land were never openly discussed.[12] While it is clear that Congress contemplated that "range" would be restricted to large acreages supporting a comparatively few head of stock,[13] there is no definitive congressional guidance as to how this standard should operate in a given factual setting.

Turning to a consideration of the available administrative authorities, it appears that the Wage & Hour and Public Contracts Divisions of the Labor Department have jointly published a comprehensive informational pamphlet[14] which discusses with striking meticulosity the proper construction and application of § 13(a) (6) (E). Incorporated within such discussion are detailed criteria for determining what lands qualify as "range" within the reach of the ex-

11. The ambiguity of the legislative history is highlighted by the colloquy between Senators Cooper and Yarborough, wherein the latter, as Senator in charge of the bill, stated: "This language was agreed to as the committee language. Beyond that, I am not prepared to attempt to interpret it." 112 Cong.Rec. 19757 (1966).

12. Conflicting inferences may be drawn from the legislative history as to whether Congress intended to confine the term "range" to lands in the western states. For instance, it is possible to infer such a restrictive intent from the following remarks by Senator Fannin:

"[The exemption] . . . would not apply only to large ranches; it could also apply to small ranches *in the West* which have larger acreages —perhaps several hundred or several thousand acres and a few head of stock.

· · ·

A good illustration would be the Basque sheepherders who are brought to this country from Spain. They are away from headquarters for long periods of time herding sheep. . . . *Of course, that is not the common kind of farmwork in this country such as the work in Kentucky, for example.*" 112 Cong.Rec. 19757 (1966) (emphasis added).

On the other hand, the fact that at no point in the legislative history is § 13(a) (6) (E) specifically limited in application to western lands tends to negate the notion that Congress viewed "range" as a peculiarly western phenomenon.

Positive evidence of legislative uncertainty regarding the geographic scope of "range" is found in the remarks of Senator Yarborough, the man principally in charge of the "range production" bill in the Senate. At one point, for example, in his discussion of the bill with Senator Gore of Tennessee, Senator Yarborough candidly stated: "I do not know if there

[sic] any range production in Tennessee or not." 112 Cong.Rec. 20619 (1966).

In light of this congressional confusion and in view of the fact that the Labor Department has publicly defined "range" *without reference to geographic location*, this Court is unwilling to draw any arbitrary lines delimiting the regions of the United States in which "range" may or may not exist. A seemingly more judicious and sensitive approach, absent a clear legislative directive to the contrary, would be to apply § 13(a) (6) (E) without overriding regard to the fortuity of geographic location. On the whole, of course, eastern lands would be much less prone to *exhibit the requisite attributes* of "range," as such term has been characterized by Congress and the Labor Department; however, the mere happenstance that a livestock producer operates on eastern soil should not, in this Court's eyes, *ipso facto* foreclose the availability of § 13(a) (6) (E).

Certainly it would seem a capricious and transparent fiction to discriminate between an eastern and western employer purely on the basis of location in an instance where:

(1) each employer's livestock enterprise operates in precisely manner;
(2) each employer's personnel perform identical duties;
(3) each employer's lands exhibit the *characteristics of "range"* developed by Congress and the Labor Department; and
(4) each employer would experience commensurate hardship in attempting to tabulate his employee hours.

13. 112 Cong.Rec. 19757 (1966) (remarks of Senator Fannin).

14. U.S. Dep't of Labor, Wage & Hour and Public Contracts Divisions, *Farmer's Guide to the Agricultural Provisions of the Fair Labor Standards Act* (1967) [hereinafter referred to as Labor Dep't Pamphlet].

emption. Of particular importance are the following excerpts from the pamphlet:

> For purposes of this exemption, "range" is defined generally as land that is not cultivated. It is land that produces native forage for animal consumption, and includes land that is re-vegetated naturally or artificially to provide a forage cover that is managed like range vegetation. "Forage" as used here means "browse" or herbaceous food that is available to livestock or game animals.
>
> The range may be on private or Federal or State land, and need not be open. Typically it is not only noncultivated land, but land that is not suitable for cultivation because it is rocky, thin, semi-arid, or otherwise poor. Typically, also, many acres of range land are required to graze one animal unit (5 sheep or 1 cow) for one month.
>
> This exemption does not apply to feed lots or to any area where the stock involved would be near headquarters.

Labor Dep't Pamphlet at 5–6.

A careful review of the evidence on file reveals that the lands comprising the Mauldin-Preuit enterprise fit very snugly within the Labor Department's definition of "range." The defendant's land has been variously described by the evidence as being generally thin, eroded to the subsoil, devoid of humus, marginal in places, sometimes rocky, steeply sloping, densely forested in spots, marshy in low-lying areas, untraversible in certain areas except on horseback, and basically of poor soil texture. The land surface is substantially noncultivated and produces an abundance of native forage[15] for consumption by the cattle. In addition, certain segments of the fenced-in acreage have been sporadically re-vegetated both naturally and artificially, through fertilizing and reseeding, to provide a supplementary forage cover[16] that is managed like range vegetation. Typically many acres of the land are required to graze one cow unit for one month with over 7,000 acres in numerous tracts normally being required to carry some 1000 to 2000 yearlings or from 500–900 cow units. There are no feed lots or other comparable intensive feeding facilities within the Mauldin-Preuit operation, and with very rare exceptions,[17] the cattle are not kept near headquarters.

 Having concluded that the defendant's lands qualify as "range" within the scope of the Labor Department's definition, the Court must next determine the amount of weight which should properly be accorded such definition. The cardinal principles of judicial deference for administrative interpretations have been eclectically summarized in a recent Fifth Circuit opinion as follows:

> [I]t is proper to show great deference to the interpretation given [a] . . . statute by the officers or

---

15. Predominant among the native grasses and clovers on the grazing tracts are Johnson grass, Dallis grass, lespedeza, and common Bermuda.

16. Fescue appears to be the only form of supplementary vegetation which has been seeded with any regularity on the defendant's full-time grazing lands. Although on a few tracts the fescue growth is fairly concentrated in spots, for the most part it is merely haphazardly scattered among the various native grasses.

> The diet of the defendant's cattle is further buttressed in winter months by wheat, which is grown on approximately 360 acres of part time grazing land, and in summer by Sudex, which is grown on a 210-acre part time grazing tract. See chart on p. 305, *supra*.

> To entice the cattle to consume the more noxious forms of wild grasses and weeds which pervade the defendant's lands, artificial nutrients known as "range cubes" or "range pellets" are regularly distributed throughout the grazing areas.

17. As was previously pointed out, the cattle are kept at headquarters for a period of about three days when they are initially purchased by the defendant. Otherwise they are ordinarily brought to headquarters only at times of illness or injury for purposes of receiving medication.

agency charged with its administration. Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616, 625 (1965); United States v. Chicago, 400 U.S. 8, 91 S.Ct. 18, 27 L.Ed.2d 9, 12–13 (1970) . . . Deference is particularly appropriate where the administrative practice at stake involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new. Power Reactor Development Co. v. Int. Union of Elect., Radio & Machine Workers, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924, 932 (1961). The construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong. Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 381, 89 S. Ct. 1794, 23 L.Ed.2d 371, 384 (1969). Federal Deposit Insurance Corp. v. Sumner Fin. Corp., 451 F.2d 898, 902 (5th Cir. 1971) (certain citations omitted).[18]

Because the Labor Department pamphlet construing § 13(a) (6) (E) states on its cover page that it "is not to be considered in the same light as official statements of position,"[19] the question arises whether the normal standard of "great deference" should obtain in this instance. While there appears to be no binding precedent in point, the Court is of the opinion that the Department's interpretation should unquestionably be given some weight[20] and should seemingly be accorded controlling emphasis on any point on which the statutory language is unclear and the legislative history unexpressive. It is felt that this high degree of deference is particularly appropriate in view of the pamphlet's copious and explicit content, its formulation by individuals who specialize in wage and hour administration, and its publication as a contemporaneous construction[21] of 13(a) (6) (E). Clearly, to the extent that the popular or commonplace understanding of the word "range" may conflict with the definition promulgated by the Labor Department, the latter should control. Hofer v. Fed-

18. See also United States v. 525 Co., 342 F.2d 759 (5th Cir. 1965) wherein the Fifth Circuit states: "Surely a contemporaneous construction by persons charged with the responsibility of setting the statute's machinery into motion should not be overturned except for very cogent reasons." Id. at 762.

The general tenor of the judicial authorities in this area is summarized at 82 C.J.S. Statutes § 359, at 767–768 (1953) as follows:

"[A]ccording to the judicial authorities on the question, such construction [by the agency charged with the administration of a statute] should not be disregarded or overturned except for the most cogent reasons, and unless clearly erroneous. The courts generally accept the construction placed on a statute by the officers charged with its administration where the construction has warrant in the record and a reasonable basis in law."

19. More specifically, the language inscribed on the face of the pamphlet reads as follows:

"This pamphlet is for general information and is not to be considered in the

same light as official statements of position contained in Interpretative Bulletins and other such releases formally adopted and published in the Federal Register."

Through discussion with the Labor Department's attorney of record, the Court gleans that the most prominent differences between an unofficial pamphlet of this nature and the formal Departmental releases are that (1) the pamphlet is apt to be written in more simplistic terms to facilitate comprehension by laymen, and (2) formal releases are generally published in the Federal Register.

20. The Labor Department itself does not deny that the pamphlet should be given "some weight" in this lawsuit.

21. " 'Contemporaneous construction' . . is the construction which executive departments or officers charged with the enforcement of the statute give to it at or near the time of its enactment." 82 C.J.S. Statutes § 359, at 768 (1953). The Labor Department pamphlet under consideration was issued at or near February 1, 1967, the effective date of § 13 (a) (6) (E).

eral Cartridge Corp., 71 F.Supp. 243, 245 (D.Minn.1947); Aulen v. Triumph Explosive, Inc., 58 F.Supp. 4, 8 (D.Md. 1944). Therefore, in accordance with the Department's announced interpretation[22] and in the face of inconclusive legislative history, the Court finds that the lands comprising the Mauldin-Preuit enterprise constitute "range" within the ambit of § 13(a) (6) (E).

> B. Do the principal duties and activities of the Mauldin-Preuit employees constitute "range production" within the meaning of § 13(a) (6) (E)?

The phrase "range production," viewed on its face, is even more enigmatic as to scope than the word "range" standing alone. From an examination of the legislative history, however, at least two things can be discerned with reasonable certainty regarding the nature of the activities which may qualify as "range production."[23] First, as Senator Yarborough emphatically points out, "range production" includes "only those . . . activities which require constant attendance on a standby basis, such as herding and similar activities, where the computation of hours worked would be very difficult." 113 Cong.Rec. 19757 (1966). See also S.Rep. No. 1487, 89th Cong., 2d Sess. (1966). Secondly, as Senator Fannin makes clear, "range production" contemplates activities which are performed away from headquarters. 112 Cong.Rec. 19757 (1966).

In order to flesh out these very basic characteristics of "range production," it is necessary once again to turn to the Labor Department's published guidelines for applying § 13(a) (6) (E). In this regard, the following passages from the Department's pamphlet are of material importance:

> This exemption . . . applies only to those employees principally engaged in activities which require constant attendance on a standby basis, away from headquarters, such as herding, where the computation of hours worked would be extremely difficult. The sole fact that an employee providing such constant surveillance generally returns to his home at the end of each day, however, would not affect the application of the exemption.

> The primary duty and responsibility of a range employee must be to take care of the animals actively or to stand by in readiness for that purpose. A determination of whether an employee has range production of livestock as his primary duty must be based on all the facts in a particular case. In the ordinary case the primary duty means the major part, or over 50 per cent of the employee's time.

> Thus, an employee who during the year spends over 50 per cent of his time on the range in such activities as herding, handling, transporting, feeding, watering, caring for, branding, tagging, protecting or otherwise assisting in the raising of livestock and in such immediately incidental duties as inspecting and repairing fences, wells and windmills and employee food

---

22. See note 18 *supra* and accompanying text.

23. In addition to the two attributes of "range production" mentioned in the text, it is clear that Congress contemplated that there would be only 10,000 employees in the U.S. "principally engaged in range production" at any one time. 112 Cong.Rec. 19757 (1966) (remarks of Senator Yarborough); S.Rep.No.1487, 89th Cong., 2d Sess. (1966), U.S.Code Cong. & Admin.News 1966, p. 3002. However, in response to the Court's query from the bench, counsel were unable to explain the origin, basis, or significance of the illusory "10,000-employee" standard to which the Congress alluded. Since § 13(a) (6) (E) should undoubtedly be applied on a case-by-case basis considering all the relevant circumstances in each instance, it is impossible to forecast in this case of first impression whether allowance of an exemption to the defendant, who employs five full-time and three part-time workers, would offend the "10,000-employee" standard.

preparation on the range, would have range production of livestock as his primary duty. On the other hand, an employee who spends over 50 per cent of his time in work such as terracing, reseeding, haying, and constructing dams, wells, and irrigation ditches would not have range production of livestock as his primary duty.

An employee who spends more than 50 per cent of his time on the range in duties designated above as range production duties would be exempt if he also performs some haying operations. His exemption status would not be affected by the fact that the hay he is putting up comes from wild rather than cultivated grass.

Labor Dep't Pamphlet at 6

■ A plenary review of the evidence on file reveals very vividly that the employees of the Mauldin-Preuit enterprise are engaged in activities constituting "range production" within the scope of the Labor Department's guidelines. It is undisputed that the primary duty of each employee [24] is to care for the defendant's cattle actively or to stand by in readiness for that purpose. The evidence further reflects that the fulfillment of this duty occupies well over 50 per cent of each employee's working time. [25] Typically, each employee spends the greater part of his work day engaged in the very activities sanctioned by the Labor Department pamphlet—i. e. "herding, handling, transporting, feeding, watering, caring for, branding, tagging, protecting or otherwise assisting in the raising of livestock." In addition, an appreciable portion of each employee's time is devoted to such incidental tasks as inspecting and repairing fences, distributing salt and minerals on the grazing lands, checking and repairing wells and water pumps, preparing access ways for vehicles to enter upon the grazing lands, and rounding up blind, sick, or stray cattle. Occasionally the employees participate in reseeding, fertilizing, and haying, though on an annual basis such activities would consume considerably less than 25 per cent of any employee's aggregate working time. As a general rule, all employees return to their homes at the end of each work day, [26] although with unpredictable fre-

24. No significant distinctions are to be drawn between the functions of the Mauldin-Preuit employees for purposes of determining the applicability of § 13 (a) (6) (E). See note 5 *supra*.

25. The defendant's testimony on this point, which was corroborated by the testimony of his employees, proceeded as follows:
"Q: What was the primary duty and responsibility of these employees during these two years [i. e. 1969 and 1970]?"
"A: To care for the cattle."
"Q: Would over 50% of the time of these employees during '69–'70 be taken up on taking care of the cattle?"
"A: I would say considerably more than 50%."
"Q: What percentage would you judge, Mr. Mauldin?"
"A: Three-fourths of their time."
"Q. In direct contact with the cattle?"
"A: That's right."

26. In its trial brief, the Labor Department emphasizes a portion of the Senate hearings in which Senator Fannin presents the following concrete example of "range production":
"A good illustration would be the Basque sheepherders who are brought to this country from Spain. They are away from headquarters for long periods of time, herding sheep. It is impracticable for them to keep time or to control their hours of work. They may be in sleeping bags at night, and they may have to get up in the middle of the night because of predatory animals attacking the sheep; then they would go out to work again." 112 Cong. Rec. 19757 (1966).
In relating Senator Fannin's illustration to the present case, it should be borne in mind that the only notable distinction between the activities of the Basque sheepherders and those of the Mauldin-Preuit cattlemen is that while the sheepherders often sleep with their flocks at night, the cattlemen generally return home at the end of each day. It would seem, however, that any significance which might otherwise attach to this distinction is directly vitiated by the Labor

quency they find themselves summoned back to work during the night to round up cattle which have penetrated fences and wandered onto public grounds. On balance, the evidence very graphically indicates that in all material respects the internal operations and activities of the Mauldin-Preuit enterprise are identical to those of the large cattle producing ranches of the western states.[27]

Inevitably, the applicability of the "range production" exemption should turn primarily upon the degree of difficulty inherent in keeping track of hours worked by the employees in question. As the congressional debates, committee reports, and administrative guidelines uniformly acknowledge, § 13(a) (6) (E) is intended to apply only "when the computation of hours worked would be *extremely difficult*." 112 Cong.Rec. 19757 (1966); S.Rep. No. 1487, 89th Cong., 2d Sess. (1966); Labor Dep't Pamphlet at 6 (emphasis added). In the case *sub judice*, there are a number of undisputed facts which, in coalescence, would spell

incalculable hardship for any proposed tabulation of employee hours. For one thing, the manifold duties of the Mauldin-Preuit employees are performed on lands ranging from one to fifteen miles from headquarters.[28] Moreover, it is not uncommon for certain employees to spend virtually entire working days on horseback, roving from herd to herd over a distance of 25 miles or more. By its very nature, the work of the employees is performed almost exclusively without supervision[29], and always the time allocable to the job fluctuates according to clemency of weather conditions, the employees' own irregular availability,[30] and the exigencies of cattle tending in general. Furthermore, the unpredictable recurrence of night recalls serves to augment the unfeasibility of precision record keeping. The confluence of the foregoing facts impels the Court to conclude that computation of hours worked by the Mauldin-Preuit employees would be "extremely difficult" within the contemplation of both congressional and administrative views of § 13(a) (6) (E).[31] It is,

Department's announcement that "[t]he sole fact that an employee . . . generally returns to his home at the end of each day . . . would not affect the application of the exemption." Labor Dep't Pamphlet at 6.

27. See testimony of Mr. Jack Mitchell and Mr. John Montgomery which convincingly establishes that the Mauldin-Preuit enterprise functions internally in precisely the same manner as the large range livestock producers of the western states.

28. The evidence indicates that while on many occasions the employees pass through the "Hall Place Range" both at the beginning and end of a working day, this is by no means an unwavering practice. See, *e. g.*, testimony of employee, Jackie Williams. Under the facts presented, it would seem highly austere and unrealistic to expect all of the defendant's employees, whose daily tasks are performed at points ranging from one to fifteen miles from headquarters, invariably to "check-in" at headquarters upon commencing and completing each day's work. Thus, in the Court's view, the initiation of a "punch-clock" time system within the Mauldin-Preuit enter-

prise would be impractical from a logistical standpoint as well as unfair to the defendant, who could not conceivably observe or supervise his employees' performance. Moreover, the looming possibility of employee recalls during the night would further undermine the practicability of a "punch-clock" system.

29. See, *e. g.*, testimony of E. H. Mauldin which points up the significantly greater burden inherent in calculating hours worked by unsupervised cattle hands far removed from headquarters, as compared with hours worked by regular agricultural employees whose time and performance are amenable to much closer scrutiny.

30. Of the eight employees presently working in the defendant's cattle enterprise, a few (the precise number being unknown) are college or high school students whose availability for work varies dramatically according to the dictates of their school curriculums.

31. See remarks of Congressmen Fisher, Berry, and Poage at 112 Cong.Rec. 11385, 11392 (1966), which reflect a deep appreciation on the part of some legislators of the staggering burden which

of course, axiomatic that in any case wherein a court resorts to statutory interpretation, it should, "if possible, place on the statute a construction which will not result in . . . oppression, hardship, or inconvenience." 82 C.J.S. Statutes § 326, at 624–625 (1953); Knowlton v. Moore, 178 U.S. 41, 77, 20 S.Ct. 747, 44 L.Ed. 969 (1900); Bate Refrigerating Co. v. Sulzberger, 157 U.S. 1, 37, 15 S.Ct. 508, 39 L.Ed. 601 (1895). Accordingly, the Court finds that the employees in question are "principally engaged in range production of livestock" within the reach of § 13(a) (6) (E), and that the defendant is exempt from minimum wage and record keeping requirements of the Fair Labor Standards Act.

■ In arriving at this decision, the Court is not unmindful of the venerable and long-standing principle that "exemptions [from the Fair Labor Standards Act] are to be narrowly construed." Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960); Mitchell v. Kentucky Fin. Co., 359 U.S. 290, 295, 79 S.Ct. 756, 3 L. Ed.2d 815 (1959). As applied in the present context, this canon would, of course, require that all genuine doubts as to meaning of the terms "range" and "range production" be resolved against the defendant. However, without in any way deprecating the salutary tenet of strict construction, the Court deems the following admonition of Justice Rutledge peculiarly applicable in this case:

> The canon in favor of strict construction is not an inexorable command to override common sense and evident statutory purpose. It does not require magnified emphasis upon a single ambiguous word [i. e. the word "range" in this case] in order to give a meaning contradictory to the fair import of the whole remaining language.

United States v. Brown, 333 U.S. 18, 25–26, 68 S.Ct. 376, 380, 92 L.Ed. 442 (1948).

To hold that the Mauldin-Preuit employees are not "principally engaged in range production of livestock" would require an effective disregard for the Labor Department's announced construction of the statute and would cast upon the defendant an impractical burden not ostensibly countenanced by the statutory language or legislative history. The inveterate canon of strict construction should not compel such a result.

Judgment will be entered for the defendant on the issue herein considered.[32]

---

would attend a requirement that a livestock producer of the defendant's genre keep careful records of his employees' hours.

32. The foregoing opinion was originally prepared as a memorandum for the Court by Kirby Sevier, Law Clerk, who was present at the evidentiary hearing. Since its excellence in form and content could not be improved upon, it has been reproduced in its entirety as the considered opinion of the Court.