James D. HODGSON, Secretary of Labor,
United States Department of Labor,
Appellant,

v.

ELK GARDEN CORPORATION et al.,
Appellees.

No. 73–1008.

United States Court of Appeals,
Fourth Circuit.

Argued May 7, 1973.

Decided June 29, 1973.

Jacob I. Karro, Atty., U. S. Dept. of Labor (Alfred G. Albert, Acting Sol. of Labor, Carin Ann Clauss, Associate Sol., Sandra P. Bloom, Atty., U. S. Dept. of Labor, Washington, D. C., and Marvin M. Tincher, Regional Atty., Nashville, Tenn., on brief) for appellant.

John H. Thornton, Jr., Roanoke, Va., (Carr L. Kinder, Jr., and Woods, Rogers, Muse, Walker & Thornton, Roanoke, Va., on brief), for appellees.

Before BRYAN, Senior Circuit Judge, and BUTZNER and FIELD, Circuit Judges.

BUTZNER, Circuit Judge:

This appeal questions the entitlement of an employer of agricultural labor to exemption from the minimum wage and recording requirements of the Fair Labor Standards Act[1] on the ground that its employees are principally engaged in the range production of livestock. The district court granted the exemption. The Secretary appealed, and we reverse.

## I

■ The issue concerns the interpretation and application of an exemption which provides that the payment of minimum wages and the maintenance of records shall not apply with respect to any employee who is "principally en-

---

[1]. The Fair Labor Standards Act passed by Congress in 1938 excluded from its coverage agricultural employees. In 1966, Congress amended the Act to extend minimum wage and recording requirements to agricultural employees working for an employer who used more than 500 mandays of agricultural labor (approximately seven employees working full time) in any calendar quarter of the preceding year. Several classes of employees are totally exempt, and agriculture generally is not subject to the overtime pay requirement of the Act. 29 U.S.C. § 213 (a)(6) and (b)(13) (1970). *See* S.Rep. No. 1487, 89th Cong., 2d Sess. 1966, U.S. Code Cong. & Admin.News, pp. 3002, 3010.

gaged in the range production of livestock."[2] In resolving this issue we must apply the canon that "exemptions are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." Arnold v. Kanowsky, 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960); *accord,* Schultz v. W. R. Hartin & Son, Inc., 428 F.2d 186, 189 (4th Cir. 1970).

■ The employer asserts that the range production exemption should be available to any cattleman if his employees produce only beef for sale by grazing on native grasses and raise only forage crops for the production of beef. The district court rejected this broad reading of the Act. It ruled that the land on which the cattle were produced must be classified as range to obtain the exemption. Concluding that the employer's land satisfied the statute's requirement in this respect and that the employees were principally engaged in producing livestock, it granted the exemption. Our interpretation of the statute differs from the district court's. It is not enough, we hold, to show merely that the land can be classified as range and that the employees are principally engaged in producing livestock. To secure the exemption the employer must additionally show that the employees' duties make the computation of their working hours extremely difficult. In this case, proof of this essential element of the exemption is absent.

Because the Act does not define range production of livestock, we must look to its legislative history for guidance. Attempts to construe the exemption on the basis of the meaning of each of its words are not particularly helpful. While "production of livestock" may be easily defined, the word "range" is susceptible of a great number of meanings, both simple and technical. Moreover, review of the legislative history discloses that the entire phrase "range production of livestock" was intended to designate a method of raising livestock, not simply the type of land on which the employees work.

The original House bill as reported from committee contained no livestock production exemption. An amendment was offered on the floor to exempt the production of livestock "on any farm or ranch" based on the irregularity of the working hours of the employees and the impracticability of keeping records.[3] This broad exemption was not adopted.

When the House bill reached the Senate, it was amended in committee to incorporate an exemption for the range production of livestock, which, it was estimated, would affect about 10,000 employees.[4] This amendment was the subject of extensive debate on the Senate floor. The proponents stressed the restrictive nature of the exemption and the difficulty of recording the hours of employees who worked at irregular times far away from headquarters. Senator Fannin, a member of the committee which reported the bill, said:

"[T]he intent of this particular amendment is restrictive. It would not apply only to large ranches; it could also apply to small ranches in the West which have large acreages—perhaps several hundred or several thousand acres and a few head of stock. Perhaps there may be 25 or more acres to 1 head of stock. Thus, the amendment is not intended to ap-

---

2. The exemption is set forth in 29 U.S.C. § 213(a)(6)(E) (1970). It has been judicially construed in only one reported case, Hodgson v. Mauldin, 344 F.Supp. 302 (N.D.Ala.) aff'd 478 F.2d 702 (5th Cir. 1973).

3. 112 Cong.Rec. 11391 (1966).

4. The Senate Report states: "The committee exempted from the agricultural coverage provision of the bill 10,000 employees who are principally engaged in the range production of livestock. The committee, because of the special circumstances of these employees, believes an exemption is appropriate." S.Rep.No. 1487, 89th Cong., 2d Sess., 1966, U.S. Code Cong. & Admin.News, pp. 3002, 3011.

ply to feed lots or to any area where the stock involved would be near headquarters. In other words, employees might be away from headquarters for weeks at a time on the range.

"A good illustration would be the Basque sheepherders who are brought to this country from Spain. They are away from headquarters for long periods of time, herding sheep. It is impractical for them to keep time or to control their hours of work. They may be in sleeping bags at night, and they may have to get up in the middle of the night because of predatory animals attacking the sheep; then they would go out to work again. Of course, that is not the common kind of farmwork in this country, such as the work in Kentucky, for example. They could be on vast ranches, but not necessarily so. This could also occur on the small ranches." [5]

Senator Javits, another committee member, identified that exempt employee as "the cowboy—the range livestock employee as we call him in a rather fancy way." [6]

The Bill, as amended by the committee, was passed by the Senate and adopted by the conference. [7] After passage, the Wage and Hour Division of the Department of Labor, the agency charged with the administration of the Act, issued the *Farmer's Guide to the Agricultural Provisions of the Fair Labor Standards Act*, which discussed the range production exemption. [8] The *Guide's* interpretation is consistent with the legislative history. Emphasizing that the exemption applies only where computation of the employee's working hours would be extremely difficult, the *Guide* flatly states that the exemption does not apply "to any area where the stock involved would be near headquarters."

In the district court and on appeal, the argument concerning the proper interpretation to be given the statutory exemption largely revolved around the question of whether "range" exists east of the Mississippi River. The Secretary insists that the land on which the employers conduct their operations is pasture, not range. He points out that recognized authorities do not classify any of Virginia's land as range. [9] The employer asserts that the land on which it grazes cattle, though formerly wooded, satisfies the description of range men-

5. See 112 Cong.Rec. 20621 (1966).

6. 112 Cong.Rec. 20483 (1966).

7. Conf.Rep.No. 2004, 89th Cong., 2d Sess., 1966, U.S.Code Cong. & Admin.News, pp. 3047, 3048.

8. The *Guide* states:

"For purposes of [the range production] exemption, 'range' is defined generally as land that is not cultivated. It is land that produces native forage for animal consumption, and includes land that is revegetated naturally or artifically to provide a forage cover that is managed like range vegetation. 'Forage' as used here means 'browse' or herbaceous food that is available to livestock or game animals.

"The range may be on private or Federal or State land, and need not be open. Typically it is not only noncultivated land, but land that is not suitable for cultivation because it is rocky, thin, semi-arid, or otherwise poor. Typically, also, many acres of range land are required to graze one animal unit (5 sheep or 1 cow) for one month.

"This exemption does not apply to feed lots or to any area where the stock involved would be near headquarters. It applies only to those employees principally engaged in activities which require constant attendance on a standby basis, away from headquarters, such as herding, where the computation of hours worked would be extremely difficult. The sole fact that an employee providing such constant surveillance generally returns to his home at the end of each day, however, would not affect the application of the exemption."

On June 17, 1972, shortly after the trial of the case, the Department of Labor issued an Interpretative Bulletin on Exemptions Applicable to Agriculture. With respect to the range exemption, it substantially repeated the comments of the Guide. 37 Fed.Reg. 12101 (1972).

9. U. S. Dep't. of Agriculture, Statistical Bull. 461, Basic Statistics—National Inventory of Soil and Water Conservation Needs, at Table 2 (1967); Virginia Polytechnic Institute Extension Division, Virginia Conservation Needs Inventory of 1967, at 21 (1970).

tioned in the *Farmer's Guide*.[10] In addition, the employer emphasizes that the forage is managed similar to range vegetation.

We think that the parties' concentration on the technical definition of range furnishes an unsatisfactory basis for interpreting the statute. The case provides an appropriate instance for the court to follow Judge Learned Hand's instruction about statutory interpretation:

> "Of course it is true that the words used, even in their literal sense, are the primary, and ordinarily the most. reliable, source of interpreting the meaning of any writing: be it a statute, a contract, or anything else. But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." [11]

Fortunately, the purpose or object of the statutory exemption is expressly stated in the Senate Report:

> "[T]he committee intends to exempt only those employees who are engaged in activities which require a constant attendance on a standby basis, such as herding and similar activities where the computation of hours worked would be extremely difficult." [12]

We conclude, therefore, that when Congress used the phrase "range production of livestock," it intended to describe a method of raising cattle or sheep in which the computation of the hours worked by employees caring for the stock would be extremely difficult. The fact that the animals are grazed on a range is not in itself controlling. The characteristics of the land become significant only when grazing involves dispersal of the stock over such a large area that the employees must be in constant attendance on a standby basis so far from headquarters that their working hours cannot be readily recorded. In final analysis, as the Senate Report clearly shows, exemption must be determined by the nature of the employees' work, not simply by the nature of the land. A proper interpretation of the statute requires us to examine the terrain on which the cattle are raised only for determining whether its characteristics require employees to work in such a manner that computation of their hours is difficult.

## II

The employer, Garvey Ranch Management, Inc. operates three farms —Elk Garden, Cochener, and Big Lonely-Tomahawk—in mountainous areas of western Virginia. All the farms are used to graze breeding cows whose calves are sold after they have been weaned. Elk Garden consists of 3,700 acres, of which 296 are cultivated. It is fenced into 14 tracts, the largest encompassing 300 acres. As of December 1970, it contained 1,057 head of cattle, giving it a stocking ratio of 3.5 acres per head. Cochener, which is fenced into 11 tracts, has 4,212 acres, including 218 under cultivation. It had 835 cattle with a stocking ratio of 5 acres per head. Big Lonely-Tomahawk consists of two tracts 9 miles apart containing 3,300 acres and 4,900 acres. On both tracts, a total of 320 acres are cultivated. There were 901 head of cattle on the combined tracts with a stocking ratio of 9.1 acres per head.[13]

---

10. See note 8 *supra*.

11. Cabell v. Markham, 148 F.2d 737, 739 (2d Cir.), aff'd 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

12. S.Rep.No.1487, 89th Cong., 2d Sess., 1966, U.S.Code Cong. & Admin.News, pp. 3002, 3012.

13. On all three farms the number of acres required to carry one head of cattle was considerably below the ratio of 25 to 1 mentioned in the Senate debate. *See* text accompanying note 5 *supra*. Moreover, the record indicates that each of the farms can carry more cattle than were reported in December 1970. During the relevant period Elk Garden had as high as 1,735 head; Cochener, 1,200; Big Lonely-Tomahawk, 1,200. The stocking ratio is significant only because it gives

Since the land is steep and rocky on all three farms, most of it cannot be cultivated, and parts of it are accessible only on foot or horse. The average yearly rainfall in the area is 40 inches and the farms are well watered. The principal forage is blue grass, orchard grass, and clover. Crops raised on the cultivated land are used entirely for winter fodder.

■ Each of the farms has a resident foreman and several full time employees. None of the employees is required to work at a distance from headquarters for long periods of time. The farthest distance at which cattle are grazed away from Elk Garden headquarters is three miles. At Cochener, the remotest point is one and one-quarter miles. The record does not furnish the maximum grazing distance from headquarters at Big Lonely-Tomahawk, but, in any event, the foreman testified that he did not have much trouble keeping in touch with his employees there.[14]

The employees care for cattle and perform customary farm jobs. The district court found that two of the employees were covered by the Act because most of their time was spent in farm work. It found that 17 of the employees were engaged in the production of livestock because they spent more than 50 percent of their time working cattle.[15] These findings are principally based on the reasonably accurate time sheets kept by the foreman on each employee in anticipation of this litigation. The record

disclosed that the foreman could tally the men's working hours with little difficulty. Neither party challenges the district court's findings about the allocation of employees' time between farm work and the production of livestock.

■ The employees' working schedules are regular, and they generally report to their headquarters at a fixed hour, both in the morning and in the evening at the end of the workday. Frequently, they return to headquarters for lunch. Variations exist in the schedule due to weather or emergencies, and some night work is necessary, particularly during calving season. The district court also found that although the employees are on call when they are needed, particularly during calving time, they are not required to stay at home. The court found that if they are at home the foreman may call on them to help him. The situation depicted by these findings is, of course, quite different from the job description of employees given in the Senate Report and the *Farmer's Guide*, which limits the exemption to those employees who are engaged in activities which require constant attendance on a standby basis . . . ."[16]

■ The legislative history and the administrative directive establish that the exemption applies only when computation of working hours is extremely difficult because the employees must constantly attend, on a standby basis, livestock that is on a range away from

some indication whether employees must work at a distance from the ranch headquarters because cattle are dispersed over large areas.

14. The record's omission of the maximum distance at Big Lonely-Tomahawk does not adversely affect the Secretary's position. The burden is on an employer—not the Secretary—to establish entitlement to exemption. Idaho Sheet Metal Works v. Wirtz, 383 U.S. 190, 206, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966).

15. The *Farmer's Guide* provides in part: "[A]n employee who during the year spends over 50 percent of his time on the range in such activities as herding,

handling, transporting, feeding, watering, caring for, branding, tagging, protecting or otherwise assisting in the raising of livestock and in such immediately incidental duties as inspecting and repairing fences, wells and windmills and employee food preparation on the range, would have range production of livestock as his primary duty. On the other hand, an employee who spends over 50 percent of his time in work such as terracing, reseeding, haying, and constructing dams, wells, and irrigation ditches would not have range production of livestock as his primary duty."

16. See nn. 8 and 12 *supra*.

the ranch's headquarters. Here the cattle are not run on a range far from headquarters. The men check in and out of headquarters daily, and they are not required to be in constant attendance on a standby basis. Most importantly, the record shows that computation of their working hours is not difficult. The employer, therefore, is not entitled to an exemption with respect to these employees.

The judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.

Reversed and remanded.