KEELE et al. v. UNION PAC. R. CO. et al.

Civ. No. 6079.

District Court, S. D. California, Central Division.

Feb. 20, 1948.

David Sokol, of Los Angeles, Cal., for plaintiffs.

E. E. Bennett, Edward C. Renwick and Malcolm Davis, all of Los Angeles, Cal., for Union Pac. R. Co.

J. F. T. O'CONNOR, District Judge.

Plaintiffs bring this action under an Act of Congress of the United States of America entitled The Fair Labor Standards Act of 1938, Act of June 25, 1938, see Chap. 676, 52 Stat. 1060, Title 29 U.S.C.A. § 201 et seq., hereinafter called The Act.

The plaintiffs, eleven in number, are all former employees of the defendant, Union Pacific Railroad Company, and were engaged in defendant's oil fields at Wilmington, California, in work and processes necessary to the production of oil and petroleum products for Interstate Commerce.

The plaintiffs allege they worked in excess of the work-weeks established by sec. 7(a) (3) of The Act, and that the defendants failed to pay the compensation for overtime hours in excess of the work-weeks prescribed by the provisions of said section, and claim that plaintiffs are entitled to additional sums equal to the amounts claimed by them as liquidated damages by virtue of the provisions of sec. 16(b) of The Act, and, in addition, claim that they are entitled to be awarded reasonable attorney fees.

It is conceded that the Union Pacific Railroad Company is a common carrier by railroad engaged in transportation of property and freight in Interstate Commerce, and is an employer subject to the provisions of Part I of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq. and the defendant contends that it is not subject to the provisions of the Act but is exempt under the provisions of Paragraph II of Paragraph b of sec. 13 of The Act, and upon official rulings of the Wage and Hour Division of the United States Department of Labor.

The defendant moved to dismiss un-named plaintiffs. The Court extended the time for other employees to join as plaintiffs. No new plaintiffs were made parties. It must be assumed, threfore, that the un-named present employees of the defendant, similarly situated, are satisfied with the terms of the contract. Abram v. San Joaquin Cotton Oil Company, D.C., 46 F.Supp. 969; Department of Justice Bulletin No. 151.

Both parties have filed extensive affidavits setting forth the facts as claimed by each party. In open court both parties stipulated the essential facts necessary to a decision are not in dispute, but both parties object to the conclusions reached by the opposing party; also plaintiffs dispute the hourly wage and computation as contended for by the defendant under the terms of the contract.

Both parties move for a Summary Judgment.

Under Rule 56, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, if all of the basic facts are undisputed and the matter is one of interpretation or the reaching of a conclusion by the Court, the Court may grant a motion for Summary Judgment. Heart of America Lumber Company v. Belove, D. C., W.D.Mo., 28 F.Supp. 619; Northland Greyhound Lines v. Amalgamated Association, etc., D.C.D.Minn., 4th Division, 66 F.Supp. 431; Fox v. Johnson & Wim-

satt, 75 U.S.App.D.C. 211, 127 F.2d 729, 737.

The plaintiffs were all electricians, and were engaged during the greater part of their time in work and process necessary to the production of crude oil by the defendants. The crude oil produced by the defendant was in an unrefined state and could not be used as fuel in the locomotives of defendant, Union Pacific Railroad Company. The defendant did not own and did not operate refinery facilities. It sold its crude oil to the Richfield Oil Corporation under an arrangement whereby the Richfield Oil Corporation supplied the defendant, in part payment for the crude oil, with large quantities of fuel oil which was consumed by the defendant in its common carrier business. Practically the same officers and employees conduct both the railroad operations and the oil operations of the Union Pacific Company. Without refined oil the oil burning engines of the defendant would be useless. It requires no argument to show the importance and close relationship between oil and the operation of oil burning engines. To say that refined oil could be purchased from other sources does not answer the question. It could be said that, while passenger depots are necessary and essential to the operation of a railroad, they could be leased from other owners rather than owned by the railroad. We must deal with a practical situation. The contract between the defendant and Richfield Oil Corporation, wherein the defendant was assured of an adequate supply of fuel oil, was made a part of the pleadings. Therefore, the question before the Court is whether these employers were exempt from the provisions of the Fair Labor Standards Act under Section 213, subdivision (b), 29 U.S.C.A., which provides: "(b) The provisions of section 207 of this title shall not apply with respect to (1) any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 304 of Title 49; or (2) any employee of an employer subject to the provisions of sections 1–27 of Title 49."

If the answer is in the affirmative, the controversy will be at an end and it will be unnecessary to go into other issues raised by the pleadings.

The plaintiffs and defendants entered into a collective bargaining contract dated January 17, 1944.

After conferences lasting many months the International Brotherhood of Electric Workers, a labor organization and an unincorporated association, represented all of the electric workers employed in the Maintenance of Way Department of Union Pacific Railroad Company. It was authorized to represent, and to bargain on behalf of, the plaintiffs, under the provisions of the Railroad Labor Act. This labor union was affiliated with System Federation No. 105 which, in turn, was affiliated with the Railroad Employees Department of the American Federation of Labor. The System Federation No. 105 was authorized to bargain on behalf of several classes of "non-operating employees" employed by the defendant, which included plaintiffs, under the Railway Labor Act, 45 U.S.C.A. § 151 et seq.

More than 13 years ago a collective bargaining agreement was entered into, between the representatives of plaintiffs and defendant, which provided for the hourly rate, and for increases in the rates, on the basis of 8 hours per day, 6 days per week, and provision also was made for a 9-hour day in the Wilmington oil fields and a guaranteed monthly salary.

Effective August 1, 1937 the plaintiffs and those similarly situated received an increase per hour recommended by the mediation agreement signed at Washington, D. C. on August 5, 1937. Representatives of the principal railroads of the United States including the defendant, and fourteen labor organizations including the International Brotherhood of Electric Workers, signed the agreement. The agreement was a culmination of the labor dispute which arose in March 1937. Again, on Sept. 1, 1941, the plaintiffs received an increase in their hourly rate, recommended by the National Mediation Board, expressed in an agreement signed at Chicago, Illinois on Dec. 15, 1941, by the same parties mentioned herein. This agreement was preceded by many conferences between

the contracting parties in which the plaintiffs demanded an increase of 30¢ per hour subject to the provision that no employee should receive less than 70¢ per hour. The Emergency Fact-finding Board appointed by the President of the United States made its recommendations, but these were not satisfactory to the labor organizations. An agreement was reached between the contracting parties named herein on January 17, 1944, which provided for additional hourly rate of increase to the plaintiffs. It will serve no useful purpose to point out the many conferences, the several hearings before the various committees and boards, and the refusal of the plaintiffs' representatives to accept the recommendation of the President of the United States. The failure to reach an agreement prior to the collective bargaining agreement of January 17, 1944 culminated in a strike-vote taken by the labor organizations which resulted in a favorable vote for a strike. The strike was set for September 30, 1943. Both the operating and the non-operating employees of the railroads participated in the vote. The crisis had been reached. Hundreds of thousands of men were affected. The President of the United States, in order to avoid the chaos which would follow a strike paralyzing the railroads of the country, on December 27, 1943 ordered the United States Army to take over the railroads of the United States, which was done.

On January 18, 1944, after an agreement had been reached, the President of the United States ordered the Army to return the railroads to private management, which was done. Further raises in pay were agreed upon by the contracting parties after the agreement of January 17, 1944.

It is important to note that all of these conferences, hearings, and agreements were held under the provisions of the Railway Labor Act.

The Fair Labor Standards Act, S-2475, was introduced by Senator Black on May 24, 1937. Section 2(7) defined "employe": "'employe' includes any individual employed * * * but shall not include any person employed in an executive, administrative, supervisory, or professional capacity * * * as such terms are defined and delimited by regulations of the board". Thus, all railroad employes were subject to the Act's provisions with the exception of the executive, professional and administrative classes. Hearings before the Senate Committee on Education and Labor brought objection from the railroad industry and from certain railroad brotherhoods, contending that railroad employes should not be included. Not all railroad employes supported the requested exemption. (Page 1194, hearings before Senate Labor Committee on S-2475). The Congressional Record, 75th Congress, 2nd Session, Volume 82, Part 2, Page 1698, demonstrates the position of the maintenance of way employes as follows: "By way of digression, I might say that while some of the other organizations do not want to be under this bill, I might indicate our position at this moment by saying that nobody appreciates the discomfort of a sore thumb as much as the person who is afflicted with it. That is why we are taking a different position here." Senator Black, the Chairman, asked: "In other words, you are the brotherhood that has the sore thumb of lower wages?" Mr. Keller replied: "That is right".

The Committee amended the Act in Section 2(7) by excluding from the definition of "Employe": "Any railroad employe subject to the provisions of the Hours of Service Act". (82 Cong.Rec. 1603) This resulted in exempting the train service employes from the Act and left, among others, the Maintenance of Way employees subject to all its provisions. The bill passed the Senate in this form.

The Hours of Service Act provides:

"The term 'employees' as used in section 61–64 of this title shall be held to mean persons actually engaged in or connected with the movement of any train." 45 U.S. C.A. § 61.

When S-2475 reached the floor of the House, only those employees subject to the Hours of Service Act were exempt. (82 Cong.Rec. 1690) On December 15, 1937, Congressman Harlan offered an amendment which exempted "Any railroad employee subject to the 'Railway Labor Act

of 1926' in lieu of employees subject to 'The Hours of Service Act'." The Railway Labor Act of 1926, 45 U.S.C.A. § 151: "* * * includes any express company, sleeping-car company, carrier by railroad, subject to Chapter 1 of Title 49, and any company which is directly or indirectly owned by or controlled by or under common control with any carrier by railroad and which operates any equipment or facilities or performs any service (other than trucking service) in connection with the transportation, receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, and handling of property transported by railroad * * *" and defines "employe":

"* * * includes every person in the service of a carrier (subject to its continuing authority to supervise and direct the manner of rendition of his service) who performs any work defined as that of an employee or subordinate official in the orders of the Interstate Commerce Commission * * *".

This amendment was rejected. At the time it was offered, the Maintenance of Way employees, as far as the record shows, were objecting to their exclusion from the Act, and Congressman Harlan's amendment would have excluded them. The next day (December 16th) Congressman Crosser, long considered the champion of railroad labor in the House of Representatives, offered an amendment to strike the Hours of Service Act exemption and substitute: "or any employe of an employer subject to Part I of the Interstate Commerce Act." (82 Cong.Rec. 1679) Objection to adoption of the amendment was immediately raised by Congressman Thomas of Texas, pointing out that the spokesman for the Maintenance of Way employees objected to their exclusion. (82 Cong.Rec. 1697, 1698) Congressman Crosser then produced a letter from the President of the Brotherhood of Maintenance of Way employees, which explained that his organization had objected to their exclusion, but by reason of developments since the hearing they were reversing their stand and "* * * would therefore ask that we be excluded from the pending wage and hours of service legislation * * *". (82 Cong.Rec. 1698)

Congressman Mead took up the support of the Crosser amendment as follows: "For a long period of time the House has eliminated railroad workers from various acts which apply to industrial workers. This was done in the case of the Wagner Labor Relations Act, 29 U.S.C.A. § 151 et seq., again in the passage of the Social Security Act, 42 U.S.C.A. § 301 et seq., and prior to that in the passage of the National Recovery Act, 48 Stat. 195, The railroads and the railroad industry have their own social and labor legislation. As you know, they have the Adamson Hours of Service Act, the Railroad Labor Act with its Mediation and Arbitration Boards, and they have the Railroad Retirement Act, 45 U.S.C.A. § 201 et seq. Therefore there is sufficient precedent for the committee to accept the amendment of the distinguished gentleman from Ohio (Mr. Crosser) *and in doing so eliminate all railroad workers from the provisions of this bill."* (Emphasis supplied.)

Congressman Griswold, supporting the amendment, stated: "The president of the maintenance-of-way men's organization and their official spokesman says they prefer not to come under the bill. The *employer and employee* are both satisfied to be left out. More than that, they prefer to be. Here is one place where we have the consummation of all that is most desirable in labor legislation. *Both employer and employee agreed on a proposition.* I hope we will refuse to *disturb that agreement."* (Emphasis supplied.)

This amendment was adopted. Thus, any employee of an employer subject to Part I of the Interstate Commerce Act was exempted from all provisions of the Act.

The scope of the employees excluded was not thereafter changed, although as finally enacted they were exempted only from the overtime provisions of the Act and not from all its provisions, as provided in the original Crosser amendment.

It seems clear from a study of the Congressional hearings and debates that Sec. 13(b) (2) of the Fair Labor Standards Act means exactly what it says: *"The provisions of Section 7 shall not apply with respect to * * * (2) any employee of*

*an employer subject to the provisions of Part I of the Interstate Commerce Act".* (Emphasis supplied.) There is no exception and there is no limitation.

The undisputed affidavit of the defendant's general auditor clearly establishes that the Interstate Commerce Commission has exercised jurisdiction over the plaintiffs and over the operations of the Wilmington oil fields. The Commission requested and was furnished detailed accounts of the oil field operations and made suggestions of changes in bookkeeping accounts with reference to "unapplied oil well material and supplies" and other items; also requesting the defendant to furnish the number of employees in the Wilmington oil fields and compensation paid each, which data included the plaintiffs. Defendant was required to, and did, comply with all of the statutes regulating employees of railroads.

(1) Defendant was required by the Railroad Retirement Tax Act, 26 U.S.C.A.Int. Rev.Code, §§ 1500–1503, to collect, and did collect, taxes from the wages earned by plaintiffs, and paid this tax into the Treasury of the United States.

(2) Defendant has paid into the Treasury of the United States the taxes required of employers with respect to each of the plaintiffs. 26 U.S.C.A.Int.Rev.Code, §§ 1520–1537.

(3) Defendant has paid to the Railroad Retirement Board, an agency of the United States, the taxes payable by employers under the Railroad Unemployment Insurance Act, for the benefit of the plaintiffs. 45 U.S.C.A. §§ 351–367. Each of the plaintiffs is entitled to the benefits of these Acts. Each of the plaintiffs, while employed by the defendant, was entitled to free railroad transportation. This Section of the Fair Labor Standards Act has been interpreted by several courts.

District Judge Bright said, in Brittan v. Hudson & Manhattan R. Co., D.C., 50 F. Supp. 37, 38:

"It does not seem to me that the nature of the employment of the plaintiffs is an important factor in the decision in this case. The phraseology of Section 13, in my opinion, removes that feature as a consideration here. The words used in subdivision (b) (2) are comprehensive, unambiguous and need no construction. They exempt from the provisions of Section 7 any employee whose employer is subject to the provisions of Part I of the Interstate Commerce Act.

"It is the engagement of the employer that determines the exemption. A comparison of the particular words so used with the balance of the section confirms me in my conclusion. Under some of the subdivisions, it is the work in which an employee is engaged which determines whether there is an exemption." Again District Judge Bright, in Anderson v. Southern Pac. Co., D.C., 62 F.Supp. 730, said: "It is difficult to see, therefore, how there can be any recovery here under the Fair Labor Standards Act. This question was considered by me with reference to employees of a railroad (engaged, it is true, as building employees and, therefore, not exactly parallel in point of fact here) in the case of Brittan v. Hudson & Manhattan Railroad Co., D.C., 50 F.Supp. 37, and a conclusion was arrived at that the defendant was exempted, the plaintiff there, as here, being an 'employee of an employer subject to the provisions' of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq."

Circuit Judge Frank, (Second Circuit), in Magnussen et al. v. Ocean S. S. Co. of Savannah et al., 162 F.2d 77, said: "Plaintiffs are 'attendants' on defendant's non-self-propelled lighters used for storage and carriage of cargo within the Port of New York. They brought suit, under § 7 of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 207, for overtime compensation and liquidated damages. Defendant pleaded exemption, under § 13(b) (2), of the Act, 29 U.S.C.A. § 213(b) (2), which provides that the maximum hour provisions shall not apply with respect to 'any employee of an employer subject to the provisions of §§ 1–27 of Title 49,' i. e., part I of Interstate Commerce Act. On the basis of this exemption provision, the court below granted defendant's motion for summary judgment."

The court concluded, 162 F.2d at page 79: "It follows that the defendant, Ocean

Steamship Company, is 'an employer subject to the provisions of §§ 1–27 of Title 49,' and consequently was properly found to be exempt from the provisions of § 7 of the Fair Labor Standards Act."

The plaintiffs emphasized the holdings, particularly, in two cases: Walling v. Connecticut Co., 2 Cir., 154 F.2d 552; Jackson v. Northwest Airlines, D. C., 70 F.Supp. 501, 506.

Neither of these cases support the contention of the plaintiffs.

In Walling v. Connecticut Company: the defendant operates an electric trolley-car line in New Haven, Conn., and its immediate vicinity, and motor-bus lines in and between several Connecticut cities, and operates also a power plant in New Haven where it engages in the production and sale of electric power. 40 to 45 men are employed by the defendant at the power-house and are on a separate payroll from that kept for the defendant's trolley and motor-bus employees. While some of the power is used by defendant in operation of its electric trolley-cars, the defendant sells between 25% and 30% of its total power to the New York, New Haven and Hartford Railroad which owns all of defendant's stock. The power is used in the operation of interstate trains and other activities such as switching compressors in its freight yards.

There was no showing in the Connecticut case that the employees of the defendant were under the jurisdiction and control of the Interstate Commerce Commission. There was no showing that they had, through their duly authorized labor representatives, arrived at a satisfactory collective bargaining agreement. They were carried as employees on the payroll of a wholly-owned subsidiary corporation, which sold power to several companies.

In Jackson v. Northwest Airlines, supra, the defendant corporation engaged in an activity entirely separate from its operation as an air transport line. Defendant engaged in bomber modification activity—the work included installation of gas tanks, various brackets, armaments, radar equipment, bombsights, armor, gun mounts, etc, as well as test firing of guns, etc. all done under the direction of the military officers.

It is clear that this activity had no direct or indirect connection with the operation of an interstate air transport line. This would seem to be the underlying basis for the opinion, and it is in direct conflict with the opinion of Judge Bright in Brittan v. Hudson & Manhattan R. Co., supra. Referring to that decision, Judge Nordbye said: "but it would seem that that decision is not sound and should not be followed". It cannot be questioned that Judge Bright followed the literal reading of the statute and applied it. That eminent jurist did not feel at liberty to modify the statute or read into it language that was not there, while Judge Nordbye believed that certain exceptions should be read into the statute. These conflicts must finally be determined by the Supreme Court.

In the instant case, the crude oil produced from defendant's wells, after being refined was actually used to drive the engines of defendant over some 3,700 miles through the State of California and other northwestern states.

In re Walling v. Rockton & Rion Railroad, D.C., 54 F.Supp. 342, 347: the Court does not believe this opinion is in point since the railroad was not subject to the provisions of the Interstate Commerce Act. Following the views expressed by the Commission, the Court held that the defendant was not entitled to the exemptions of Sec. 13(b) (2), stating: "Certainly it was not intended by this exemption to exclude a carrier not subject to regulation by the Interstate Commerce Commission."

The Supreme Court answered a question similar to the one raised in this case, in re Pedersen v. Delaware, Lackawanna & Western Railroad Company, 229 U.S. 146, at page 151, 33 S.Ct. 648, 649, 57 L.Ed. 1125, Ann.Cas.1914C, 153—"Was that work being done independently of the interstate commerce in which the defendant was engaged, or was it so closely connected therewith as to be a part of it? Was its performance a matter of indifference so far as that commerce was concerned, or was it in the nature of a duty resting upon the carrier? The answers are

obvious. Tracks and bridges are as indispensable to interstate commerce by railroad as are engines and cars; and sound economic reasons unite with settled rules of law in demanding that all of these instrumentalities be kept in repair."

It seems to this Court that there would be little use for tracks and bridges and cars if there were no fuel oil available for the engines. It does not satisfy logical reasoning to say that the oil could have been secured from some other source. We must deal with a practical situation.

The attention of the Court is called to the fact that the Supreme Court does not favor collective bargaining agreements. Jewell Ridge Coal Corporation v. Local No. 6167, United Mine Workers of America et al., 325 U.S. 161, 65 S.Ct. 1063, 89 L.Ed. 1534. While that was a five-four decision, it was the law of the land until the Congress of the United States nullified the decision as a precedent by the passage of the Portal-to-Portal Act, 29 U.S.C.A. chap. 9, § 251 et seq. Few decisions in the Supreme Court evoked more discussion. The Chief Justice and Mr. Justice Roberts, Mr. Justice Frankfurter, and Mr. Justice Jackson, dissented from the majority opinion. The issue was sharply drawn and there was an irreconcilable conflict between the minority and majority opinions. The majority opinion paved the way for the Portal-to-Portal Act. The Congress of the United States, in its findings and declaration of policy, said: "The Congress finds that the Fair Labor Standards Act of 1938, as amended, has been interpreted judicially in disregard of long-established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities, immense in amount and retroactive in operation, upon employers with the results that, if said Act as so interpreted or claims arising under such interpretations were permitted to stand, (1) the payment of such liabilities would bring about financial ruin of many employers and seriously impair the capital resources of many others, thereby resulting in the reduction of industrial operations, halting of expansion and development, curtailing employment, and the earning power of employees; * * *" and enumerates nine other reasons and justifications for the Portal-to-Portal Act.

■ In view of this criticism by the Congress of the United States, this court should not attempt to modify, or read into the plain language of the statute, words or meaning not expressed therein. It is the opinion of this court that the statute is as clear as the English language can make it, when it says: "(b) The provisions of section 207 of this title shall not apply with respect to (1) any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 304 of Title 49; or (2) any employee of an employer subject to the provisions of sections 1–27 of Title 49."

It is for Congress to amend the statute if Congress agrees with the position of the plaintiffs and not for this court. Plaintiffs are clearly under the jurisdiction of the Interstate Commerce Commission.

The collective bargaining agreement dated January 17, 1944 is an exceedingly carefully drawn contract, and the rights of all of the parties are clearly set forth. Besides all of the leading railroads which are signatories to the contract, the employees were represented by the following participating labor organizations, which included these plaintiffs: International Association of Machinists; International Brotherhood of Boilermakers, Iron Ship Builders and Helpers of America; International Brotherhood of Blacksmiths, Drop Forgers and Helpers; Sheet Metal Workers' International Association; International Brotherhood of Electrical Workers; Brotherhood Railway Carmen of America; International Brotherhood of Firemen and Oilers, Round House and Railway Shop Laborers; Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees; Brotherhood of Maintenance of Way Employees; The Order of Railroad Telegraphers; and the Brotherhood of Railroad Signalmen of America; National Organization Masters, Mates and Pilots of America; National Marine Engineers' Beneficial Association; International Longshoremen's Association; Hotel and

Restaurant Employees' International Alliance and Bartenders' International League of America.

The court finds that the defendants have acted in the highest good faith as shown by the affidavits. Engl v. Aetna Life Ins. Co., 2 Cir., 139 F.2d 469.

The motion by defendant for summary judgment is granted.

Defendant to prepare Findings of Fact, Conclusions of Law and Judgment within five days.