**N.J. TRANSIT POLICEMEN'S BENEVOLENT ASSOCIATION LOCAL 304**

v.

**NEW JERSEY TRANSIT CORPORATION,**
Appellant.

No. 86–5259.

United States Court of Appeals,
Third Circuit.

Argued Sept. 16, 1986.

Decided Dec. 2, 1986.

Rehearing and Rehearing En Banc
Denied Jan. 27, 1987.

Alfred G. Osterweil (argued), Alfred G. Osterweil, P.A., Edgewater, N.J., for appellee.

W. Cary Edwards, Atty. Gen. N.J., Robert H. Stoloff (argued), Deputy Atty. Gen., James J. Ciancia, Asst. Atty. Gen., Newark, N.J., for appellant.

Edward D. Friedman (argued), Elizabeth A. Ginsburg, Friedman & Wirtz, Washington, D.C., for amicus curiae.

Before ADAMS and STAPLETON, Circuit Judges, and GARTH, Circuit Judge.

**OPINION OF THE COURT**

STAPLETON, Circuit Judge.

This case presents a question of statutory interpretation. Did a savings clause subjecting New Jersey Transit Corporation (N.J. Transit) to "applicable laws of the United States related to ... dealings between employees and employers" preserve its exemption from the overtime rules of the Fair Labor Standards Act (FLSA)? The district court found, based on the "plain language" of the statute, that it did not. We conclude that the statute, when read with an eye to its purpose and to the regulatory scheme in existence at the time

of its enactment, evidences an intent to preserve the FLSA overtime exemption.

## I.

N.J. Transit, an instrumentality of the State of New Jersey that operates commuter rail service, was sued by New Jersey Transit Policemen's Benevolent Association, Local 304 (Local 304), for failure to comply with the provision of the Fair Labor Standards Act that requires employers to pay employees one and one-half times their regular wage for hours worked in excess of forty per week. 29 U.S.C. § 207(a) (1982). N.J. Transit moved to dismiss this claim, asserting that its employees fell within one of the categorical exemptions from the overtime rules listed in Section 213(b). The relevant provision exempts:

any employee of an employer engaged in the operation of a common carrier by rail and subject to the provisions of subchapter I of chapter 105 of title 49 [Part I of the Interstate Commerce Act]

29 U.S.C. § 213(b)(2) (1982).

In response to the motion to dismiss, Local 304 pointed out that N.J. Transit was not currently subject to the provisions of Interstate Commerce Act (ICA) and argued that it was accordingly not entitled to the exemption provided by Section 213(b)(2) of the FLSA. While N.J. Transit acknowledged that it was not now subject to Interstate Commerce Commission (ICC) regulation, it insisted that the 1976 statute removing commuter railroads such as N.J. Transit from the jurisdiction of the ICC included a savings clause which preserved their overtime exemption. This 1976 statute, now codified as amended at 49 U.S.C. § 10504, reads in relevant part as follows:

(b) The Interstate Commerce Commission does not have jurisdiction under this subtitle over rail mass transportation provided by a local public body if—

(1) the Commission would have jurisdiction but for this section; and

(2) the fares of the local public body, or its authority to apply to the Commission for changes in those fares, is subject to the approval or disapproval of the chief executive officer of the State in which the transportation is provided.

(c) Notwithstanding subsection (b) of this section, a local body, described in subsection (b), is subject to applicable laws of the United States related to—

(1) safety;

(2) the representation of employees for collective bargaining; and

(3) employment retirement, annuity, and unemployment systems or other provisions related to dealings between employees and employers.

49 U.S.C. § 10504 (1982). The parties agree that N.J. Transit satisfies the conditions for the Section 10504(b) exemption from ICC regulation. They disagree only with respect to the effect of the Section 10504(c) savings clause.

The district court denied N.J. Transit's motion to dismiss holding that the Section 10504(c) savings clause did not preserve the Section 213(b)(2) overtime exemption. It also determined that the order denying N.J. Transit's motion to dismiss involved "a controlling question of law as to which there is substantial ground for difference of opinion and [that] an immediate appeal from the order may advance the ultimate termination of the litigation." App. at 4. This court granted N.J. Transit's petition for appeal of the statutory construction question pursuant to 28 U.S.C. § 1292(b). Accordingly, the only issue before us is whether the Section 213(b)(2) overtime exemption is preserved by the Section 10504(c) savings clause. Our review of questions of statutory interpretation is plenary.

## II.

"Where, as here, resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if statutory language is unclear." *Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). In seeking to discern Congression-

al intent from the legislative text, a court must be mindful of the statute's object and policy and must read the disputed provision in the context of the entire statute and the provisions of related statutes. *Richards v. United States*, 369 U.S. 1, 11, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962); *Commissioner of Internal Revenue v. Engle*, 464 U.S. 206, 217, 104 S.Ct. 597, 604, 78 L.Ed.2d 420 (1984); *Kokoszka v. Belford*, 417 U.S. 642, 650, 94 S.Ct. 2431, 2436, 41 L.Ed.2d 374 (1974).

### A. *The Text*

The relevant provision states that, notwithstanding Section 10504(b), commuter railroads like N.J. Transit are "subject to applicable laws of the United States related to—(1) safety; (2) the representation of employees for collective bargaining; and (3) employment retirement, annuity, and unemployment systems or other provisions related to dealings between employees and employers." 49 U.S.C. § 10504(c) (1982). The district court read "dealings" in the last clause to mean "business interactions," which it found to include negotiations over collective bargaining agreements but not rules concerning wages or hours. App. at 41. We disagree. The use of the phrase "other provisions related to dealings between employees and employers" in conjunction with the preceding references to safety, labor negotiations, retirement, and unemployment implies that Congress had a broad conception of "dealings." Moreover, the district court's equation of dealings with negotiations would render the final clause of the provision redundant, given the language of Section 10504(c)(2) preserving laws "related to . . . the representation of employees for collective bargaining," a reference to the Railway Labor Act. 45 U.S.C. § 151, *et seq.* In short, a law concerning overtime pay requirements is, on its face, a provision relating to dealings, or business interactions, between employees and employers.

A more plausible argument is that the phrase "subject to applicable laws of the United States" refers only to affirmative regulation imposed by federal law and not to exemptions from such statutory regulation. This argument was apparently adopted by the district court when it found that " 'applicable laws of the United States' refers to broad statutory schemes . . . not to narrowly tailored specific exemptions from statutory schemes." App. at 16. The *amicus curiae* makes the same argument in somewhat different terms when it asserts that the phrase "subject to" is inconsistent with the preservation of a regulatory exemption since a railroad cannot be "subject to" a beneficial exception. While we find this parsing of the legislative text plausible, it is not compelling. The point is not whether this somewhat inartfully drafted statute means to make N.J. Transit "subject to" a beneficial exemption. The statute makes N.J. Transit "subject to applicable laws" and the question then is whether Section 207(a) of the FLSA is an "applicable law" or not. If the Section 207(a) overtime provisions are meant not to be applicable because of the exemption, then N.J. Transit is simply not "subject to" *the overtime requirements;* thus, the semantic problem of being "subject to" an exemption would appear to be off the mark. The real issue, then, is whether the Congressional intent was that "applicable laws" *include* the FLSA overtime requirements, or continue, as had been the case for the preceding four decades, to *exclude* those provisions.

Textual parsing, especially here, is not alone an indisputable indication of Congressional intent. Rather, we believe this textual analysis must be tested by reference to the purpose of the statute and the legislative history. When the savings clause is read against this background, it becomes clear that it was intended to maintain the status quo in all of the areas referred to in subsection (c) and that this result can be achieved only by construing it to preserve the overtime exemption as well as coverage by the railroad employment laws.

### B. *The Statutory Purpose*

Initially, it is important to put the savings clause of Section 10504 in the context

of the law as it existed immediately before its adoption by Congress. Historically, Congress has elected to regulate the relationship of railroad workers with their employers in a series of statutes independent of those which apply to other industrial workers and their employers. Thus, the Railway Labor Act, 45 U.S.C. § 151, *et seq.*, rather than the Labor Management Relations Act, 29 U.S.C. § 141, *et seq.*, governs labor-management relations in the railroad industry. Other examples include the Railroad Retirement Tax Act, 26 U.S.C. § 3231, *et seq.*, the Railroad Retirement Act of 1974, 45 U.S.C. § 231, *et seq.*, the Railroad Unemployment Insurance Act, 45 U.S.C. § 351, *et seq.*, the Federal Employee Liability Act, 45 U.S.C. § 54, and the Hours of Service Law, 45 U.S.C. § 61. All of these statutes were in force in 1976 immediately prior to the passage of Section 10504. The 1976 regulatory environment for railroads also included Section 213(b)(2) of the FLSA which exempted railroad workers from the overtime provisions of that Act. The Railway Labor Act, 45 U.S.C. § 151, the Railroad Retirement Tax Act, 26 U.S.C. § 3231(g), the Railroad Retirement Act, 45 U.S.C. § 231(a)(1)(i), the Railroad Unemployment Insurance Act, 45 U.S.C. § 351(b), and the Section 213(b)(2) overtime exemption each defined their applicability by reference to the Interstate Commerce Act.

The exemption from the overtime provisions of the FLSA was granted to railroads in recognition of the nature of railroad operations and the fact that such operations may result in irregular hours for railroad workers. *See Southland Gasoline Co. v. Bayley*, 319 U.S. 44, 48–49, 63 S.Ct. 917, 919–20, 87 L.Ed. 1244 (1943). The reference to the ICA was made solely for the purpose of identifying the workers to be covered by the exemption and not because the ICA provided an alternative scheme for regulating overtime compensation. This is clear from the fact that the scope of the exemption, as originally proposed, was defined by reference to employees covered by the Hours of Service Act and reference to the ICA was substituted by amendment in order to make sure that all types of railroad workers were included in the exemption.[1] *See Keele v. Union Pacific Railroad Co.*, 78 F.Supp. 678 (S.D. Cal.1948) and the legislative history detailed therein.

It is undisputed that commuter rail lines, such as the service now operated by N.J. Transit, were subject to this special railroad regulatory scheme—including ICC regulation, coverage by the railroad employment statutes, and exemption from the overtime provisions of the FLSA—prior to the passage of Section 10504 in 1976.

Section 10504, as the district court recognized, represents a Congressional judgment that ICC regulation of publicly-operated commuter rail lines is unnecessary when their fares are subject to control by the chief executive of a state. Thus, the purpose of Section 10504 was to free this subclass of railroads from redundant rate control mechanisms by removing it from the jurisdiction of the ICC. The issue presented by this case is whether Section 10504 also reflects a Congressional intent to otherwise alter the regulatory environment in which this subclass of railroads had been operating prior to its passage. We find no evidence of such an intent. To the contrary, when Section 10504 is read in the context of the pre-existing law, we believe it evidences an intent to preserve the

---

1. The dissent argues that exemptions from the FLSA should be narrowly construed. There is, however, no dispute as to the meaning of § 213(b)(2). The pertinent question is whether § 10504(c) should be construed to provide for the continued application of § 213(b)(2) notwithstanding the change in ICC jurisdiction enacted in § 10504(b).

Moreover, unlike the dissent, we believe the Supreme Court's decision in *Garcia v. San Anto-*

*nio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), is unhelpful in resolving this dispute. *Garcia* involved an intrastate bus operator, not a railroad. The one-time exemption from the FLSA discussed in *Garcia,* namely 29 U.S.C. § 213(a)(9) [repealed], related to employees of local mass transit operators. The overtime exemption applicable to railroad employees under § 213(b)(2) was not at issue.

status quo in all of the areas subsumed under Section 10504(c), including the area of overtime compensation.

The Section 10504(c) savings provision is necessary because, as we have seen, a number of statutes regulating the activities of railroads define their applicability by reference to the Interstate Commerce Act. The reference in subsection (c)(2) to "the representation of employees for collective bargaining," for example, clearly preserves the regulation afforded by the Railway Labor Act. The references to "retirement, annuity, and unemployment systems" preserve the regulation provided by the Railroad Retirement Tax Act, the Railroad Retirement Act of 1974, and the Railroad Unemployment Insurance Act. Similarly, we believe the sweeping reference to "other provisions related to dealings between employees and employers" reflects a Congressional intent to preserve the regulatory status quo with respect to other statutes in the area of employment relations whose applicability might have been altered by changing the ICC's jurisdiction.[2]

In this context, we think it highly unlikely that Congress used the phrase "subject to applicable laws of the United States" to indicate that only statutes affirmatively regulating railroad activity, and not exemptions, were to be preserved. The district court's reading of this phrase necessarily attributes to Congress a decision to impose a hybrid and unique regulatory environment on this small subclass of railroads, one involving both the special railroad employment statutes and the FLSA overtime rules. Yet, neither Local 304 nor the *amicus curiae* has suggested any reason why Congress might have chosen to fashion such a hybrid scheme applicable only to publicly-operated commuter lines whose

fares are controlled by the chief executive of their states. While the statutory definition of this subclass of railroad provides a ready explanation as to why Congress might decide to remove them from ICC jurisdiction, there is nothing about the subclass which would suggest a rationale for changing the laws governing their employee relations. In particular, we can perceive no reason why Congress might wish commuter rail lines whose rates are controlled in this manner to be subject to the overtime provisions of the FLSA while other commuter rail lines remain entitled to the Section 213(b)(2) exemption. In short, consideration of the purpose of Section 10504 and the regulatory context in which it was enacted strongly suggests that the savings clause was intended to preserve the status quo across the entire spectrum of railroad employment regulation. We turn now to the legislative history.

### C. *The Legislative History*

The ICA exemption now contained in Section 10504 was originally enacted as a part of the Railroad Revitalization and Regulatory Reform Act of 1976. Pub. L. No. 94–210, § 804, 90 Stat. 31, 139 (1976). The exemption in this statute was broader than the current law, exempting from ICC regulation all commuter passenger service provided by local public bodies. The savings clause was contained in this first effort. Later in the same year, Congress, as a part of the Rail Transportation Improvement Act, narrowed the ICA exemption to railroad commuter passenger service provided by local public bodies the fares of which were subject to control by the chief executive officer of the state. Pub. L. No. 94–555, § 206, 90 Stat. 2613, 2621 (1976). The legislative histories of these Acts comment

---

**2.** The dissent argues that N.J. Transit does not qualify for the § 213(b)(2) overtime exemption unless we find that § 10504(c) saved Part I of the ICA with respect to N.J. Transit. While we agree with the dissent that it would be absurd to find that § 10504(c) preserved the ICC regulation explicitly halted in § 10504(b), we do not agree that such a finding is necessary to find that N.J. Transit continues to qualify for the overtime exemption. We note that ICC jurisdic-

tion determines the applicability of the Railway Labor Act, the Railroad Retirement Act, the Railroad Retirement Tax Act, and the Railroad Unemployment Insurance Act. Judge Garth's formulation would necessarily lead to the conclusion that these laws, in addition to the overtime exemption, no longer apply to N.J. Transit. Under this analysis, we would perceive no function that is served by the savings clause.

only briefly on Section 10504. In neither instance is anything said or done which suggests that Congress believed it was effecting any change other than a narrowing of the ICC's jurisdiction.[3]

When Congress abandons previously articulated policies, one "would normally expect some expression by Congress that such results are intended." *United States v. United Continental Tuna Corp.*, 425 U.S. 164, 169, 96 S.Ct. 1319, 1323, 47 L.Ed.2d 653 (1976). Finding no such expression here in the legislative history and further finding in the statutory text a strong indication that Congress intended to maintain the status quo in the area of employment relations, we hold that Section 10504 does not deprive N.J. Transit of its exemption from the overtime provisions of the FLSA.

### III.

In response to the question certified by the district court, we conclude that the Section 213(b)(2) exemption from the overtime provisions of the FLSA was preserved by the Section 10504(c) savings clause. It follows that the district court erred in denying N.J. Transit's motion for dismissal of the overtime claim. We therefore vacate the order denying N.J. Transit's motion so that the district court may enter an order consistent with this opinion. Each party will bear its own costs.

GARTH, Circuit Judge, dissenting:

The Policemen's Benevolent Association (PBA) represents police employed by the New Jersey Transit Corporation (NJT) who on occasion work overtime by testifying at mandatory court hearings, by receiving special police training, and by attending briefings at roll calls. The PBA argues that 29 U.S.C. § 207, the Fair Labor Standards Act (FLSA), entitles its members who work overtime at these and other tasks to overtime rates of compensation instead of "straight pay." NJT, on the other hand, claims that it need not pay overtime, because NJT comes within the terms of 29 U.S.C. § 213(b)(2), which exempts certain rail carriers from the operation of § 207.

The majority agrees with NJT and holds that NJT is excluded from paying overtime rates by virtue of a statutory exemption from paying such overtime for "any employee of an employer engaged in the operation of a common carrier by rail and *subject to the provisions of Part I of the Interstate Commerce Act*" (ICA). 29 U.S.C. § 213(b)(2) (emphasis added). Part I of the ICA contains the rate regulatory provisions of the Act.

In my view, NJT is not exempt from the overtime rate requirements prescribed by the Fair Labor Standards Act, as it cannot be considered "subject to" the provisions of Part I of the ICA, or the catch-all clause of 49 U.S.C. § 10504(c)(3). Consequently, I am satisfied that NJT must adhere to the requirements of 29 U.S.C. § 207 and pay overtime rates for overtime work. Accordingly, I must dissent.

### I.

New Jersey Transit concedes that it was exempted from the fare regulations provided in Part I of the ICA because its fares are subject *not* to ICA approval but to approval by the Governor of New Jersey. Appellant's brief at 8; 49 U.S.C. § 10504(b). Because the Commission has no jurisdiction over NJT owing to this circumstance, NJT cannot share in the overtime exemption [29 U.S.C. § 213(b)(2) ] given to those rail carriers who *are* regulated by ICA. This immunity from ICA fare regulation, and therefore ICA jurisdiction, represents a benefit or privilege granted by Congress to NJT. See brief of Amicus Curiae at 5; *see also* infra, dis. op., at 458–59.

NJT asserts, however, that an obscure clause found within an ambiguous proviso

---

**3.** *See, e.g.,* S.Conf.Rep. No. 595, 94th Cong., 2nd Sess. (on Pub.L. No. 94–210), *reprinted in* 1976 U.S.Code Cong. & Ad.News, 14, 148, 237; House Conf.Rep. No. 1743, 94th Cong., 2nd Sess. (on Pub.L. No. 94–555), *reprinted in* 1976 U.S.Code Cong. & Ad.News 5837, 5846, 5863.

of 49 U.S.C. § 10504(c), which itself is found within a subsidiary provision of that statute—49 U.S.C. § 10504(c)(3)—restores to NJT the overtime exemption which it otherwise would have lost because it was no longer under ICA jurisdiction. 49 U.S.C. § 10504(c) provides in full:

(c) Notwithstanding subsection (b) of this section, a *local public body, described in subsection (b), is subject to applicable laws* of the United States *related to—*

(1) safety;

(2) the representation of employees for collective bargaining; and

(3) employment retirement, annuity, and employment systems or other *provisions related to dealings between employees and employers.*

NJT relies upon so much of the statute as I have underlined above and which reads; "... a local public body, described in subsection (b), is subject to applicable laws related to ... provisions related to dealings between employees and employers." Thus NJT, to succeed, must first establish that the "applicable law" to which it is subject is the Interstate Commerce Act, Part I, which regulates rates. Secondly, it must establish that the "provision related to dealings between employees and employers" "subjects" NJT to 29 U.S.C. § 213(b)(2), and thus would free NJT from paying overtime rates for overtime work. Without even consideration of the tortured construction of 49 U.S.C. § 10504(c)(3)— which NJT must urge in order to give any semblance to its argument—it is evident that NJT cannot bring itself within the overtime exemption statute because Part I of ICA cannot be an "applicable law" insofar as NJT is concerned.[1]

NJT and the majority opinion maintain that owing to § 10504(c), NJT has been subjected to the terms of the Railroad Labor Act; subjected to the terms of the

Railroad Retirement Act; subjected to the laws of the Pension System; subjected to the Federal Employers Liability Act; and subjected to other Federal laws which regulate the nationwide railroad system. App. at 61–2. They more significantly contend that § 10504(c) "subjects" NJT to the "other provisions related to dealings between employees and employers," or, in the context of this case, to the exemption from overtime pay that ICC regulated carriers enjoy. Appellant's Brief at 20.

I cannot agree, for at least four reasons. First, this analysis is contrary to our court's accepted approach to the interpretation of exemptions from FLSA overtime pay requirements. Second, it cannot be harmonized with the legislative history of Part I of the ICA. Third, this line of reasoning conflicts with the result that would be reached through ordinary principles of statutory construction. Finally, not only does the majority distort the plain language of § 10504(c), but also it errs in attributing to § 10504(c) the obligations to which NJT is subject and which originate in other statutes.

## II.

Recognizing a need for a national wage and overtime policy, there has been a congressional trend, recognized by the Supreme Court in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), to expand, rather than to contract the protections extended to workers through the FLSA overtime provision. In *Garcia*, the Court observed that Congress has been ever more inclusive in applying FLSA to mass transit authorities:

When the FLSA was enacted in 1938, its wage and overtime provisions did not apply to local mass-transit employees or, indeed, to employees of state and local

---

1. NJT would have us read § 10504(c) to the effect that it, NJT, is subject to the exemption statute, § 213(b)(2), by virtue of § 10504(b)(3)'s "other provisions related to dealings between employees and employers." Not only does such a construction strain the plain meaning of the statute, but from the standpoint of sheer grammatical construction, the phrasing of § 10504(c) in terms of "subject to," is awkward and is obviously not intended to reach the result for which NJT contends.

governments. In 1961, Congress extended minimum-wage coverage to employees of any private mass-transit carrier whose annual gross revenue was not less than $1 million. Five years later, Congress extended FLSA coverage to state and local-government employees for the first time by withdrawing the minimum-wage and overtime exemptions from public hospitals, schools, and mass-transit carriers whose rates and services were subject to state regulation. At the same time, Congress eliminated the overtime exemption for all mass-transit employees other than drivers, operators, and conductors.... The FLSA obligations of public mass-transit systems like [San Antonio's] were expanded in 1974 when Congress provided for the progressive repeal of the surviving overtime exemption for mass-transit employees. Congress simultaneously brought the States and their subdivisions further within the ambit of the FLSA by extending FLSA coverage to virtually all state and local-government employees.

*Garcia*, 105 S.Ct. at 1008–9 (1985) (citations omitted).

Both in this court and elsewhere, exceptions to the overtime requirements of the FLSA are to be read narrowly. "Exemptions from the Fair Labor Standards Act are to be narrowly construed against the employer. The burden of proof is on the employer to establish an exemption." *Guthrie v. Lady Jane Collieries, Inc.*, 722 F.2d 1141, 1143 (3d Cir.1983). *See also Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966); *Paul v. Petroleum Equipment Tools Co.*, 708 F.2d 168 (5th Cir.1983); *Brennan v. South Davis Community Hospital*, 538 F.2d 859 (10th Cir.1976); *Brennan v. Southern Productions, Inc.*, 513 F.2d 740 (6th Cir.1975); *Hodgson v. Elk Garden Corp.*, 482 F.2d 529 (4th Cir.1973).

The record in this case is utterly barren of proof of Congressional intent to exempt carriers such as NJT from paying overtime rates. Indeed, in Part III of this dissent, I call attention to the legislative history of § 10504, which clearly mandates that NJT's purported exemption from paying overtime rates cannot be revived by any reference to the Interstate Commerce Act as an "applicable law". Thus, to the extent that NJT must carry the burden to establish an exemption, this record reveals that NJT has failed. And to the extent that the majority opinion construes § 10504(c) in such an overly expansive fashion, so as to provide NJT with an exemption from overtime pay where none has been authorized by Congress, that interpretation runs counter to the views that have been expressed by judicial authorities including the Supreme Court.

### III.

The majority maintains that it is implausible to suppose that Congress intended to require carriers such as NJT to pay overtime rates when Congress enacted § 10504, because reference to the Interstate Commerce Act in the Fair Labor Standard Act was "made solely for the purpose of identifying the workers to be covered by the exemption and not because the ICA provided an alternative scheme for regulating overtime compensation." Maj. Op., at 454. In this way, the majority construes the FLSA provision [29 U.S.C. § 213(b)(2)] as one which would ensure that all types of railroad workers were included in the FLSA overtime exemption. I cannot agree with this simplistic argument which has no precedent whatsoever for its support.

It should be noted, first, that *Keele v. Union Pacific R.R.*, 78 F. Supp. 678 (1948), upon which the majority relies, maj. op., at 454, holds that the overtime provision [§ 213(b)(2)] is unambiguous, and precise; it "means exactly what it says: 'The provisions of Section 7 [an earlier codification of the overtime exemption] shall not apply with respect to.... (2) any employee of an employer subject to the provisions of Part I [rate regulations] of the Interstate Commerce Act.' There is no exception and there is no limitation." 78 F.Supp. at 682–83. Nothing in *Keele* or any other provision of either statute, or, in the legislative

history, can bring NJT, which is *not* under ICA regulations, within the exemption provisions of § 213(b)(2).

Second, while it is true that the unique legislative history of the railroad industry may have fostered a broad overtime exemption from FLSA requirements, it is also true that the peculiar aspects of *commuter* rail systems led to the limited, experimental deregulatory option which Congress, in 1976, provided only to commuter rail systems, thus permitting such systems to escape Interstate Commerce regulations. New Jersey Transit chose to take advantage of this escape route from its very inception, and by doing so, lost the concomitant right to be free from paying overtime rates.

Thus, while ICA fare regulation and exemption from overtime rates was extended to the broad category of rail mass transit, NJT and similar commuter rail lines obtained the possibility of immunity from such fare regulations (a benefit), while suffering whatever burdens (including payment of overtime rates) might ensue. NJT did so in the process of political negotiation that accompanied the passage of the Rail Revitalization and Regulatory Reform Act of 1976, 29 U.S.C. § 10504. *See, e.g.,* 122 Cong. Rec. H35,158 (daily ed. Oct. 1, 1976) (statement of Rep. Skubitz). *See also* Conference Report, Pub.L. 94–555, 5 U.S.Code Cong. & Adm.News 5837, 5863 (1976).

Contrary to the majority's view, the legislative history of negotiations that occurred prior to the enactment of the 1976 amendments to the Rail Revitalization and Regulatory Reform Act of 1976 suggests that the purpose of § 10504 was not merely to avoid "redundant rate control mechanisms," as the majority claims, maj. op., at 454, but rather, it was part of a larger effort to promote substantive regulatory reform. 122 Cong. Rec. H35,158 (daily ed. Oct. 1, 1976); Conference Report, Pub.L. 94–555, 5 U.S.Code Cong. & Adm. News 5863 (1976). Nowhere in the "reform" legislation is it intimated that an exemption from overtime payments was to be retained by intrastate commuter rail

carriers while at the same time the same carriers were to receive local rate autonomy. Thus the reference to "applicable law" found in § 10504(c) must be read as a limitation on the degree of freedom from regulation being conferred, not as a preservation by Congress of the pre–1976 amendment status quo, as the majority claims. *See* Maj.Op., at 453.

Furthermore, the legislative history of § 10504 indicates that the regulatory apparatus of the ICA (Part I, concerned with rates) was not among the "applicable laws" to which § 10504 refers. The predecessor to § 10504(c) stated:

> (1)(A) *Except as provided in subparagraph (B) of this paragraph,* no local public body which provides mass transportation services by rail, and which is otherwise subject to the Interstate Commerce Act shall, with respect to the provision of such services, be subject to the Interstate Commerce Act or to rules, regulations, and orders promulgated under such Act, if the interstate fares, or the ability to apply to the Interstate Commerce Commission for changes thereto, of such local public body is subject to approval or disapproval by a Governor of any State in which it provides services.
>
> (B) Any local public body described in subparagraph (A) of this paragraph shall continue to be subject to applicable Federal laws pertaining to (i) safety, (ii) the representation of employees for purposes of collective bargaining, and (iii) employment, retirement, annuity, and unemployment systems or any other provision pertaining to dealings between employees and employers.

45 U.S.C. § 744(j)(1) (emphasis added).

The words in 1(A), "Except as provided in subparagraph (B) of this paragraph" were deleted when Congress reenacted these paragraphs as the present § 10504. The historical revision notes to the present § 10504 indicate that these words were omitted "as unnecessary because the Commission does not have jurisdiction over safety, collective bargaining, and employee

benefit matters, *and those matters are covered by other provisions of title 49 related to the Secretary of Transportation.*" 49 U.S.C.A. § 10504 (1986 Supp.). While NJT concedes that the jurisdiction of the Interstate Commerce Commission and its rates are not applicable to it because of the express provision of § 10504(b)(2), which exempts carriers from ICC jurisdiction where the governor of the state approves the carrier's fares, it nevertheless claims that because § 10504(c) refers to employment retirement, annuity, and employment systems or other provisions "related to dealings" between employees and employers—matters collateral to rate regulation—it therefore also should receive all other "benefits" that arise from the Commissioner's rate regulations contained in Part I. One of those benefits, NJT argues, is the overtime exemption which interstate carriers can claim. In order to reach this conclusion, NJT, as I have earlier noted, must claim to be a carrier "subject to the applicable laws of the United States," and one of those applicable laws necessarily must be the rate regulation of the ICA found in Part I.

However, the revision of § 10504(c) clearly indicates that while NJT may be subject to provisions relating to employment retirement, annuity, employment systems and the like, these are matters that are *not* encompassed in the rate regulations of Part I, but rather are found elsewhere in Title 49. If therefore, NJT's theory that it need not pay overtime rates depends upon NJT being subject to the rate regulations of Part I of the ICA, it is obvious that NJT's theory is faulty because both under § 10504(b)(2) and under the 1976 amendment to the ICA it is clear that NJT's rates are *not* regulated by the Interstate Commerce Commission. Thus, any argument relying on the rate provisions of the ICA (Part I) as constituting an "applicable law" to which NJT is subject, is flawed, and such a contention cannot support any claimed exemption from paying overtime rates.

## IV.

It defies ordinary principles of statutory construction to argue that § 10504(c), a general savings clause in one statute [The Interstate Commerce Act], should be construed as negating the effect of a specific provision [for overtime] in another statute [The Fair Labor Standards Act]. Sutherland, *Statutory Construction* at 47.08 (4th Ed. Sands, 1972) (where there is doubt concerning the extent of the application of a proviso on the scope of another statute's operation, the proviso must be strictly construed). More specifically, it is awkward, if not contradictory, to conclude that a general clause [49 U.S.C. § 10504] which in essence narrows the scope of NJT's *privilege* (immunity from ICC fare regulation) also makes it "subject to" *yet another privilege* (exemption through 29 U.S.C. § 213(b)(2) from the overtime requirements of 29 U.S.C. § 207). As the district court below aptly wrote, NJT would like to interpret § 10504(c) "to mean that 'despite (its) exemption from ICC regulation, it is still governed by laws applicable to railroad employment, including the exemption from the FLSA overtime provisions.'" App. at 17. As I have shown, however, NJT's interpretation must be rejected.

The Fair Labor Standards Act, 29 U.S.C. § 207, establishes the obligation of carriers to pay overtime rates unless the carrier is exempt by virtue of 29 U.S.C. § 213(b)(2), and this exemption can be granted only where the carrier is under ICA jurisdiction. NJT, however, is not under ICA jurisdiction. Therefore it is § 207 of the Act to which NJT properly is subject. There is no reason why NJT cannot be "subject to applicable laws ... related to dealings between employees and employers," and thus subject to FLSA overtime rules, and at the same time be excluded from the FLSA overtime exemption, which applies *only* to carriers under the Commerce Commission's jurisdiction.[2] The fact that the ICA regula-

---

2. The majority suggests, maj. op., at 453, that the ruling of the court below depended upon a narrow reading of the word "dealings" in the last clause of § 10504(c). This is not the case.

tions contain a provision stating that a transit system [NJT] not covered by ICA railroad fare regulations must still comply with other, non-ICA railroad regulations, does not create contradictions or any ambiguity, as NJT has suggested. To the contrary, the legislation should be given its plain meaning, requiring all commuter rail carriers such as NJT to pay overtime if the carrier has taken advantage of not being rate regulated by the Interstate Commerce Commission.

## V.

Recognizing that § 10504 absolves NJT from ICA regulation, that provision nevertheless requires that NJT comply with those laws having to do with (i) safety; (ii) collective bargaining; and (iii) employment retirement, annuity, and employment systems, and other provisions. But each of these obligations springs directly from the applicable laws themselves. *See, e.g.,* 45 U.S.C. § 51 (common carrier liability); 29 U.S.C. § 201 *et seq.* (Fair Labor Standards Act); 45 U.S.C. § 351 (unemployment insurance requirements); and 26 U.S.C. § 3231 (railroad retirement tax requirements). Such obligations are not found in the rate regulatory scheme of Part I of the ICA, as we have pointed out.

Moreover, it adds nothing to the majority's position to argue that because each of these separate obligations originate under acts which require that the carrier be subject to ICC jurisdiction, my analysis if accepted would require that NJT no longer be subject to the safety, collective bargaining and employment provisions of § 10504(c)(3). The short answer to that argument is that § 10504(c)(3) by its *specific* terms requires that NJT be subject to the terms of the Railroad Labor Act, Railroad Retirement Act, and Federal Employ-

er's Liability Act. *See* Dis. Op., at 457, *supra.* Section 10504(c)(3), however, does not by its terms provide that NJT shall have the § 213(b)(2) exemption enjoyed by rail carriers under ICC jurisdiction. Thus, the argument made in the majority's opinion (see maj. op., at 455, n. 2) falls of its own weight when the text of the relevant statute, § 10504(c)(3), is examined and given its plain meaning.

NJT suggests that if the district court's interpretation, with which I agree, is correct, 29 U.S.C. § 213(b)(2) would "appear to be the only statute which is generally applicable to relationships between railroad employees and employers which would not be applicable to NJ Transit ... [and] these other laws have substantial negative financial and operational impacts on NJ Transit, costing NJ Transit more than twenty million dollars annually and amounting to seventeen percent of its labor costs." Appellant's Brief at 22. This calculation of costs, of course, means little without a corresponding calculation of benefits. In particular, it ignores the benefit of freedom from federal fare regulation that NJT now enjoys. More importantly, NJT wrongly implies that this interpretation of § 10504(c), rather than the applicable laws themselves, creates the negative financial burden under which NJT claims to suffer. Under the legislative scheme reflected by 49 U.S.C. § 10504(c), I see nothing unfair in requiring NJT to satisfy its required obligations under the various statutes, including the FLSA. My analysis does no more than refuse to permit NJT to have its cake (be free from ICA rate regulation) and eat it, too (be exempt from overtime payments).

## VI.

For these reasons, I would affirm the judgment of the district court. Because

Judge Debevoise based his opinion on an expansive view of § 10504, and concluded that the language used in § 10504(c)(3) was meant to refer to broad statutory schemes such as FLSA as a whole. He explored the meaning of "dealings" only as an implausible alternative. App. at 16. Like Judge Debevoise, I do not believe that the grammatical awkwardness of

§ 10504(c) justifies concentrating on the single phrase "dealings with employees," at the expense of the other terms of the statute. App. at 41. Even if "dealings" is taken in the sense that the majority urges however, NJT would still not have been bound by the ICA, because it was not an "applicable law". *See supra,* dis. op., at 458–59.

the majority rules otherwise, I respectfully dissent.